NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (Cal. State Bar No. 149886)
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (Cal. Bar No. 274184)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3391
    Facsimile: (213) 894-0142
    E-mail:  John.Kucera@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | No. CV 18-8750 |
|---|---|
| Plaintiff, | **VERIFIED COMPLAINT FOR FORFEITURE** |
| v. | 18 U.S.C. §§ 981(a)(1)(A) & (C) |
| ANY AND ALL FUNDS SEIZED FROM RABO BANK ACCOUNT '4721, | [U.S.P.I.S.] |
| Defendant. | |

PERSONS AND ENTITIES.................................................6

    FUNDS HELD IN THE NAME OF POSTING SOLUTIONS:...................6

    FUNDS HELD IN THE NAME OF CEREUS PROPERTIES LLC:..............6

    ASSETS HELD BY OR FOR THE BENEFIT OF BY MICHAEL LACEY:.........7

    ASSETS HELD BY OR FOR THE BENEFIT JAMES LARKIN:...............9

    ASSETS HELD BY OR FOR THE BENEFIT OF JOHN BRUNST:............11

    ASSETS HELD BY OR FOR THE BENEFIT OF SCOTT SPEAR:............11

    FUNDS HELD IN THE NAME OF PRIMUS TRUST.......................12

    FUNDS HELD IN THE NAME OF GOLD LEAF SRO......................12

    FUNDS HELD IN THE NAME OF PROTECCTIO SRO.....................13

    FUNDS HELD IN THE NAME OF VARICOK COMPANY SRO................13

    FUNDS HELD IN THE NAME OF AD TECH BV.........................13

    FUNDS HELD IN THE NAME OF PROCOP SERVICES BV.................14

    FUNDS HELD IN THE NAME OF GULIETTA GROUP BV..................14

    FUNDS HELD IN THE NAME OF UNIVERSADS BV......................14

    FUNDS HELD IN THE NAME OF CASHFLOWS EUROPE LIMITED...........15

    ASCIO/WMB INC DOMAIN NAMES...................................15

    SURRENDERED DOMAIN NAMES.....................................16

    OTHER BACKPAGE SURRENDERED ASSETS............................18

NATURE OF THE ACTION AND CLAIMS FOR RELIEF.........................20

JURISDICTION AND VENUE.............................................21

I.   The Formation and Evolution of Backpage......................24

II.  The Sources and Manipulation of Backpage Criminal Proceeds....26

    A.   Backpage Promotion of Prostitution and Sex Trafficking...26

    B.   Payments for Advertising on Backpage.....................35

    C.   Bases for Forfeiture.....................................40

III. Assets Representing, Traceable To, and Involved In

2

Specified Unlawful Activity...................................41

    A.   Account 1 (Prosperity '7188 Funds)......................41

CEREUS PROPERTIES ASSETS.........................................42

    B.   Account 2 (Compass '3873 Funds).........................42

    C.   Account 3 (Compass '4862 Funds).........................43

MICHAEL LACEY ASSETS.............................................43

    D.   Account 4 (FFS&L of SR '3620 Funds).....................43

    E.   Accounts 5-10 (RBA '2485, '1897, '3126, '8316, '8324, and '8332)......................................................44

    F.   Account 11 (SFFCU '2523 Funds)..........................44

    G.   Account 12 (IOLTA '4139)................................45

    H.   The Sebastopol Property.................................45

    I.   San Francisco, California Property 1....................46

    J.   San Francisco Property 2................................47

    K.   San Francisco Property 3................................48

    L.   Sedona Property.........................................48

    M.   Paradise Valley Property 1..............................53

    N.   Paradise Valley Property 2..............................49

JAMES LARKIN ASSETS.............................................49

    O.   Accounts 13, 15, 16, 17, AND 18 (RBA '1889, '2592, '1938, '1897, '8103, '8162, AND '8189)....................49

    P.   Accounts 19 AND 20 (PCTC ACCOUNT '0012 FUNDS, PERKINS COIE '0012)..........................................50

    Q.   Account 21 (ACF '2020).................................51

    R.   Accounts 22 AND 23 (BA '8225 and '7054)................52

    S.   Saint Helena Property...................................52

    T.   Chicago Property........................................53

    U.   Paradise Valley Property 7..............................53

JOHN BRUNST ASSETS..................................................54

    V.   Account 24 (COMPASS BANK '3825)..........................54

    W.   Account 25, 26, 27, 28, 29, 30 (AB '6878, '4954,
       '7982, '7889, '7888 AND '6485)........................54

SCOTT SPEAR ASSETS.................................................55

    X.   Accounts 31, 32, AND 33 (NBA '0178, '0151, and'3645).....55

    Y.   Account 34 (Live Oak Bank Account '6910).................56

    Z.   Account 35 and 36 (Ascensus Broker Services '4301
       and'8001)..............................................56

PRIMUS TRUST ASSETS................................................56

    AA.  Account 37 (K&H Bank Account '1210).....................56

AD TECH BV ASSETS..................................................57

    BB.  Accounts 56, 57, and 58 (Fio Bank '5803, '5801, and
       '5805)................................................57

    CC.  Accounts 47, 48, 49 and 50 (BF Accounts 'K000 K, 'K000
       U, 'K000 E, and 'K001 K)..............................58

GOLD LEAF SRO FUNDS HELD AT FIO BANK...............................59

    DD.  Account 38, 39, and 30 (Fio Bank '2226, '2231, and
       '2230)................................................59

PROTECCTIO SRO FUNDS HELD AT FIO BANK..............................59

    EE.  Accounts 41, 42, and 43 (Fio Bank '4194, '4196, and
       '4198)................................................59

VARICOK SRO FUNDS HELD AT FIO BANK.................................60

    FF.  Accounts 44, 45, and 46 (Fio Bank '8083, '8086, and
       '8080)................................................60

PROCOP SERVICES BV FUNDS HELD AT KNAB BANK.........................60

    GG.  Account 51 (KB '7664)..................................60

GULIETTA GROUP BV FUNDS HELD AT RABO BANK..........................61

    HH.  Accounts 52 and 53 (RB '2452 and '4721)................61

CASHFLOWS EUROPE LTD FUNDS HELD FOR GULIETTA GROUP B.V.,
    UNIVERSADS B.V., PROCOPSERVICES B.V. and PROTECCIO SRO........62

II.   Account 55 (SP '1262)..................................62

JJ.   Account 54 (LHVP '4431)..............................62

BACKPAGE-CONTROLLED DOMAIN NAMES..................................63

KK.   ASCIO/WMB Inc Domain Names...........................63

LL.   SURRENDERED DOMAIN NAMES.............................65

BACKPAGE SURRENDERED ASSETS.......................................75

MM.   Assets Surrendered To The United States By Backpage......75

NN.   BACKPAGE FUNDS PREVIOUSLY HELD AT DAVIS WRIGHT
      TREMAINE.............................................77

FIRST CLAIM FOR RELIEF............................................78

(18 U.S.C. § 981(a)(1)(C)).......................................78

SECOND CLAIM FOR RELIEF..........................................78

(18 U.S.C. § 981(a)(1)(A)).......................................78

THIRD CLAIM FOR RELIEF...........................................79

(18 U.S.C. § 981(a)(1)(A)).......................................79

VERIFICATION.....................................................81

The United States of America brings this complaint against the above-captioned asset(s) and alleges as follows:

## PERSONS AND ENTITIES

1.  The plaintiff is the United States of America ("plaintiff" or the "government").

2.  The defendant is Any and All Funds Seized from Rabo Bank Account '4721, (hereinafter, the "Defendant Asset" or "Account 53").

3.  The Defendant Asset is held in the names of UniversAds BV. The persons and entities whose interests may be affected by this action are UniversAds BV, Michael Lacey, James Larkin, Scott Spear, John "Jed" Brunst, Daniel Hyer, Andrew Padilla, and Joye Vaught.

4.  Contemporaneously with the filing of this complaint, plaintiff is filing related actions seeking the civil forfeiture of the following assets (collectively, the "Subject Assets"):

**FUNDS HELD IN THE NAME OF POSTING SOLUTIONS:**

a.  $3,374,918.61 seized from Prosperity Bank account '7188 ("Prosperity '7188 Funds" or "Account 1") held in the name of Posting Solutions, LLC.[1]

**FUNDS HELD IN THE NAME OF CEREUS PROPERTIES LLC:**

b.  $5,462,027.17 seized from Compass Bank account '3873 ("Compass '3873 Funds" or "Account 2"), held in the name of Cereus Properties, LLC, an entity owned or controlled by Scott Spear.

c.  $407,686.14 seized from Compass Bank account '4862 ("Compass '4862 Funds" or "Account 3"), held in the name of Cereus Properties, LLC.

---

[1] Attached hereto as exhibit A is an index of the Subject Assets that consist of funds or securities on deposit at or seized from financial institutions.

6

1         **ASSETS HELD BY OR FOR THE BENEFIT OF MICHAEL LACEY:**

2       d.    $689,884.48 seized from First Federal Savings & Loan of San

3 Rafael account '3620 ("FFS&L of SR '3620 Funds" or "Account 4"), held

4 in the name of Michael Lacey ("Lacey");

5       e.    $515,899.85 seized from Republic Bank of Arizona account

6 '2485 ("RBA '2485 Funds" or "Account 5"), held in the name of Lacey;

7       f.    $75,835.31 seized from Republic Bank of Arizona account

8 '1897 ("RBA '1897 Funds" or "Account 6"), held in the name of Lacey;

9       g.    $500,000.00 seized from Republic Bank of Arizona account

10 '3126 ("RBA '3126 Funds" or "Account 7"), held in the name of Lacey;

11       h.    $600,000.00 seized from or frozen in Republic Bank of

12 Arizona Certificate of Deposit ("CDARS")[2] account'8316 ("RBA '8316

13 Funds" or "Account 8"), held in the name of Lacey;

14       i.    $302,177.57 seized from or frozen in Republic Bank of

15 Arizona CDARS account '8324 ("RBA '8324 Funds" or "Account 9"), held

16 in the name of Lacey;

17       j.    $300,000.00 seized from or frozen in Republic Bank of

18 Arizona CDARS account '8332 ("RBA '8332 Funds" or "Account 10"), held

19 in the name of Lacey;

20       k.    $734,603.70 seized from or frozen in Credit Union account

21 '2523 ("SFFCU '2523 Funds" or "Account 11"), held in the name of

22 Lacey;

23       l.    $2,412,785.47 seized from or frozen in place at Money Gram,

24 having originated from Midfirst Bank account '4139 ("IOLTA[3] '4139" or

25

26      [2] CDARS is a program that allows a depositor to spread funds across several banks in order to maintain account balances below the

27 Federal Deposit Insurance Corporation's insurance limits at any particular bank.

28      [3] An "IOLTA" is the common name for an Interest on Lawyer Trust Account.

Account 12), held in the name of attorney, "J.B." for the benefit of Lacey;

m.   All right and title to the real property located in Sebastopol, California titled in the name of Finca Manzana for Sebastopol, LLC ("Sebastopol Property"), APN 076-100-0008-000, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom; [4]

n.   All right and title to the real property located in San Francisco, California titled in the name of Lacey and Alyson Talley ("San Francisco Property 1"), APN 07-1008-057-01, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

o.   All right and title to the real property located in San Francisco, California titled in the name of  Casa Bahia for San Francisco, LLC ("San Francisco Property 2"), APN 0563-029, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

p.   All right and title to the real property located in San Francisco, California titled in the name of Lacey ("San Francisco Property 3"), APN 0097C011, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

q.   All right and title to the real property located in Sedona, Arizona titled in the name of Creek Hideaway, LLC ("Sedona Property"), APN 405-06-001B, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents,

[4] Pursuant to Local Rule 5.2-1, only the city and state of residence addresses are set forth in this Complaint

1   and profits derived therefrom;

2       r.   All right and title to the real property located in

3   Paradise Valley, Arizona titled in the name of Lacey ("Paradise

4   Valley Property 2"), APN 164-05-122, including all appurtenances,

5   improvements, and attachments thereon, as well as all leases, rents,

6   and profits derived therefrom;

7           **ASSETS HELD BY OR FOR THE BENEFIT OF JAMES LARKIN:**

8       s.   $1,546,076.35 seized from Republic Bank of Arizona account

9   '1889 ("RBA '1889 Funds" or "Account 13"), held in the name of James

10  Larkin ("Larkin");

11      t.   $1,001,731.18 seized from Republic Bank of Arizona account

12  '2592 ("RBA '2592 Funds" or "Account 14"), held in the name of

13  Larkin;

14      u.   $206,156.00 seized from Republic Bank of Arizona account

15  '1938 ("RBA '1938 Funds" or "Account 15"), held in the name of

16  Larkin;

17      v.   $501,248.14 seized from Republic Bank of Arizona account

18  '8103 ("RBA '8103 Funds" or "Account 16"), held in the name of

19  Larkin;

20      w.   $251,436 seized from Republic Bank of Arizona account '8162

21  ("RBA '8162 Funds" or "Account 17"), held in the name of Larkin;

22      x.   Any and all funds on deposit in Republic Bank of Arizona

23  account '8189 ("RBA '8189 Funds" or "Account 18"), held in the name

24  of Larkin.  RBA is holding the account until it matures, at which

25  time RBA will issue a check to the government for all funds in

26  Account 18;

27      y.   $621,832.06 in U.S. currency seized from Perkins Coie Trust

28  Company account '0012 ("PCTC '0012 Funds" or "Account 19"), held in

9

1   the name of Margaret Larkin ("M. Larkin");

2       z.  $9,882,828.72 in securities or investment instruments

3   seized from Perkins Coie Trust Company account `0012 ("PCTC

4   Investment Funds" or "Account 20"), held in the name of M. Larkin;

5       aa.  $34,149,280.00 seized from Acacia Conservation Fund LP

6   account `2020 ("ACF Funds" or "Account 21"), held in the name of

7   Ocotillo Family Trust;

8       bb.  $278.73 seized from Bank of America account `8225 ("BA

9   `8225 Funds" or "Account 22"), held in the name of Troy C. Larkin

10   ("T. Larkin");

11       cc.  $1,038.42 seized from Bank of America account `7054 ("BA

12   `7054 Funds" or "Account 23"), held in the name Ramon Larkin ("R.

13   Larkin");

14       dd.  All right and title to the real property located in

15       Paradise Valley, Arizona titled in the name of Larkin ("Paradise

16   Valley Property 1"), APN 173-11-006C, including all appurtenances,

17   improvements, and attachments thereon, as well as all leases, rents,

18   and profits derived therefrom;

19       ee.  All right and title to the real property located in Saint

20   Helena, California titled in the name of Larkin and M. Larkin,

21   Trustees for Ocotillo Family Trust ("Saint Helena Property"), APN

22   030-050-028-000, including all appurtenances, improvements, and

23   attachments thereon, as well as all leases, rents, and profits

24   derived therefrom;

25       ff.  All right and title to the real property located in

26       Chicago, Illinois titled in the name of John C. Larkin ("J.C.

27   Larkin"), M. Larkin and Larkin ("Chicago Property"), APN 20-14-201-

28   079-1054, including all appurtenances, improvements, and attachments

1   thereon, as well as all leases, rents, and profits derived therefrom;

2           **ASSETS HELD BY OR FOR THE BENEFIT OF JOHN BRUNST:**

3       gg.   $359,527.06 seized from Compass Bank account number '3825

4   ("Compass '3825 Funds" or "Account 24"), held in the name of the

5   John Brunst Family Trust;

6       hh.   $5,848,729.00 seized from Alliance Bernstein account '6878

7   ("AB '6878 Funds" or "Account 25"), held in the name of the Brunst

8   Family Trust;

9       ii.   $372,878.00 seized from Alliance Bernstein account '4954

10  ("AB '4954 Funds" or "Account 26"), held in the name of the Brunst

11  Family Trust;

12      jj.   $342,596.00 seized from Alliance Bernstein account '7982

13  ("AB '7892 Funds" or "Account 27"), held in the name of the Brunst

14  Family Trust;

15      kk.   $306,277.00 seized from Alliance Bernstein account '7889

16  ("AB '7889 Funds" or "Account 28"), held in the name of the Brunst

17  Family Trust;

18      ll.   $275,328.00 seized from Alliance Bernstein account '7888

19  ("AB '7888 Funds" or "Account 29"), held in the name of the Brunst

20  Family Trust;

21      mm.   $527,624.00 seized from Alliance Bernstein account '6485

22  ("AB '6485 Funds" or "Account 30"), held in the name of the Brunst

23  Family Trust;

24          **ASSETS HELD BY OR FOR THE BENEFIT OF SCOTT SPEAR:**

25      nn.   $404,374.12 seized from National Bank of Arizona account

26  '0178 ("NBA '0178 Funds" or "Account 31"), held in the name of Scott

27  Spear ("Spear");

28      oo.   $1,925.80 seized from National Bank of Arizona account

'0151 ("NBA '0151 Funds" or "Account 32"), held in the name of Spear and Ellona Spear ("E. Spear"); and

pp.  $613,573.28 seized from National Bank of Arizona account '3645 ("NBA '3645 Funds" or "Account 33"), held in the name of Spear and E. Spear Family Trust.

qq.  $260,283.40 seized from National Bank of Arizona account '6910 ("NBA '6910 Funds" or "Account 34"), held in the name of Spear and E. Spear Family Trust.

rr.  $64,552.82 seized from or frozen in Ascensus Broker Services '4301 ("ABS '4301 Funds" or "Account 35"), held in the name of Natasha Spear ("N. Spear").

ss.  $56,902.99 seized from or frozen in Ascensus Broker Services '8001 ("ABS '8001 Funds" or "Account 36"), held in the name of N. Spear.

**FUNDS HELD IN THE NAME OF PRIMUS TRUST**

tt.  $16,500,000 seized from K&H account '1210 ("K&H '1210 Funds" or "Account 37"), held in the name of Primus Trust, with Lacey being at least one of the beneficiaries of the Trust.  The bank is located in Hungary.

**FUNDS HELD IN THE NAME OF GOLD LEAF SRO**

uu.  €1,680,028.85 seized from Fio account '2226 ("Fio '2226 Funds" or "Account 38"), held in the name of the Gold Leaf SRO.  The bank is located in the Czech Republic;

vv.  £60.98 seized from Fio account '2231 ("Fio '2231 Funds" or "Account 39"), held in the name of the Gold Leaf SRO.  The bank is located in the Czech Republic;

ww.  $72.87 seized from Fio account '2230 ("Fio '2230 Funds" or "Account 40"), held in the name of the Gold Leaf SRO.  The bank is

located in the Czech Republic;

**FUNDS HELD IN THE NAME OF PROTECCTIO SRO**

xx.  €3,213,937.82 seized from Fio account '4194 ("Fio '4194 Funds" or "Account 41"), held in the name of the Protecctio SRO.  The bank is located in the Czech Republic;

yy.  $52.90 seized from Fio account '4196 ("Fio '4196 Funds" or "Account 42"), held in the name of the Protecctio SRO.  The bank is located in the Czech Republic;

zz.  £52.65 seized from Fio account '4198 ("Fio '4198 Funds" or "Account 43"), held in the name of the Protecctio SRO.  The bank is located in the Czech Republic;

**FUNDS HELD IN THE NAME OF VARICOK COMPANY SRO**

aaa.  €605,976.95 seized from Fio account '8083 ("Fio '8083 Funds" or "Account 44"), held in the name of the Varicok Company SRO. The bank is located in the Czech Republic;

bbb.  £458.99 seized from Fio account '8086 ("Fio '8086 Funds" or "Account 45"), held in the name of the Varicok Company SRO.  The bank is located in the Czech Republic;

ccc.  $48.10 seized from Fio account '8080 ("Fio '8080 Funds" or "Account 46"), held in the name of the Varicok Company SRO. The bank is located in the Czech Republic.

**FUNDS HELD IN THE NAME OF AD TECH BV**

ddd.  Any and all funds seized from Bank Frick account 'K000 K ("BF 'K000 K Funds" or "Account 47") on or about June 1, 2018, held in the name of Ad Tech BV.  The bank is located in the Principality of Liechtenstein;

eee.  Any and all funds seized from Bank Frick account 'K000 U ("BF 'K000 U Funds" or "Account 48") on or about June 1, 2018, held

13

in the name of Ad Tech BV.  The bank is located in the Principality of Liechtenstein;

fff. Any and all funds seized from Bank Frick account 'K000 E ("BF 'K000 E Funds" or "Account 49") on or about June 1, 2018, held in the name of Ad Tech BV.  The bank is located in the Principality of Liechtenstein;

ggg. Any and all funds seized from Bank Frick account 'K001 K ("BF 'K001 K Funds" or "Account 50") on or about June 1, 2018, held in the name of Ad Tech BV.  The bank is located in the Principality of Liechtenstein.

**FUNDS HELD IN THE NAME OF PROCOP SERVICES BV**

hhh. Any and all funds seized from Knab Bank account '7664 ("KB '7664 Funds" or "Account 51") on or about May 24, 2018, held in the name of Procop Services BV.  The bank is located in the Kingdom of the Netherlands.

**FUNDS HELD IN THE NAME OF GULIETTA GROUP BV**

iii. Any and all funds seized from Rabo Bank account '2452 ("RB '2452 Funds" or "Account 52") on or about May 24, 2018, held in the name of the Gulietta Group BV.  The bank is located in the Kingdom of the Netherlands.

**FUNDS HELD IN THE NAME OF UNIVERSADS BV**

jjj. Any and all funds seized from Rabo Bank account '4721 ("RB '4721 Funds" or "Account 53") on or about May 24, 2018, held in the name of the UniversAds BV.  The bank is located in the Kingdom of the Netherlands.

**FUNDS HELD IN THE NAME OF OLIST OU**

kkk. Any and all funds seized from LHV Pank account number '4431 ("LHVP '4431 Funds" or "Account 54") on or about June 15, 2018, held

14

in the name of Olist Ou ("Ou").  The bank is located in the Republic
of Estonia.

**FUNDS HELD IN THE NAME OF CASHFLOWS EUROPE LIMITED**

lll. £747,664.15 seized from Saxo Payments account '1262 ("SP
'1262 Funds" or "Account 55"), held in the name of the Cashflows
Europe Limited ("Cashflows").  Cashflows is holding these funds for
the benefit of Gulietta Group B.V., Universads B.V, Procop Services
B.V., and Proteccio SRO, each of which is an entity owned or
controlled by Backpage (defined below).  United Kingdom law
enforcement officials have restrained the funds held by these four
companies and consolidated them into this Saxo Payments account. The
bank is located in the United Kingdom.

**ASCIO/WMB INC DOMAIN NAMES[5]**

mmm. atlantabackpage.com; backpage.be; backpage.com;
backpage.com.br; backpage.cz; backpage.dk; backpage.ee; backpage.es;
backpage.fi; backpage.fr; backpage.gr; backpage.hu; backpage.ie;
backpage.it; backpage.lt; backpage.mx; backpage.net; backpage.no;
backpage.pl; backpage.pt; backpage.ro; backpage.si; backpage.sk;
backpage.us; backpage-insider.com; bestofbackpage.com;
bestofbigcity.com; bigcity.com; chicagobackpage.com;
denverbackpage.com; newyorkbackpage.com;
phoenixbackpage.com;sandiegobackpage.com;seattlebackpage.com; and
tampabackpage.com (collectively, the "Seized Domain Names"), and all

---

[5] Backpage, which operated principally online, controlled
numerous internet domain names.  These domain names were registered
by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar.
Domain registrars serve to ensure that a registered domain name is
not licensed to more than one user.  Domain registration allows the
owner of the domain to direct internet traffic to a specific
webserver.

rights and privileges associated therewith.

SURRENDERED[6] DOMAIN NAMES

nnn. admoderation.com; admoderators.com; adnet.ws;
adplace24.com; adplaces24.com; adpost24.com; adpost24.cz;
adquick365.com; adreputation.com; ads-posted-mp.com; adsplace24.com;
adspot24.com; adspots24.com; adsspot24.com; adtechbv.co.nl;
adtechbv.com; adtechbv.nl; advert-ep.com; adverts-mp.com; axme.com;
back0age.com; backpa.ge; backpaee.com; backpage-insider.com;
backpage.adult; backpage.ae; backpage.at; backpage.ax; backpage.be;
backpage.bg; backpage.bg; backpage.ca; backpage.cl; backpage.cn;
backpage.cn; backpage.co.id; backpage.co.nl; backpage.co.nl;
backpage.co.nz; backpage.co.uk; backpage.co.ve; backpage.co.za;
backpage.com; backpage.com.ar; backpage.com.au; backpage.com.ph;
backpage.cz; backpage.dk; backpage.ec; backpage.ee; backpage.ee;
backpage.es; backpage.fi; backpage.fi; backpage.fr; backpage.fr;
backpage.gr; backpage.gr; backpage.hk; backpage.hk; backpage.hu;
backpage.hu; backpage.ie; backpage.in; backpage.it; backpage.jp;
backpage.kr; backpage.lt; backpage.lv; backpage.lv; backpage.me;
backpage.mx; backpage.my; backpage.net; backpage.nl; backpage.no;
backpage.no; backpage.nz; backpage.pe; backpage.ph; backpage.pk;
backpage.pl; backpage.porn; backpage.pt; backpage.ro; backpage.ro;
backpage.se; backpage.sex; backpage.sg; backpage.si; backpage.si;
backpage.sk; backpage.sk; backpage.sucks; backpage.tw; backpage.uk;
backpage.uk.com; backpage.us; backpage.vn; backpage.xxx;
backpage.xyz; backpagecompimp.com; backpagecompimps.com;

_____

[6] On April 5, 2018, in the District of Arizona, Backpage.com,
LLC and related entities plead guilty to 18 U.S.C. § 1956(h) (money
laundering conspiracy).  Pursuant to its guilty plea, Backpage
surrendered certain assets, including those identified herein.

16

1  backpagepimp.com; backpagepimps.com; backpagg.com; backpagm.com;

2  backpagu.com; backpaoe.com; backpawe.com; backqage.com; backrage.com;

3  backxage.com; bakkpage.com; bcklistings.com; bestofbackpage.com;

4  bestofbigcity.com; bickpage.com; bigcity.com; bpclassified.com;

5  bpclassifieds.com; carlferrer.com; clasificadosymas.com;

6  clasificadosymas.net; clasificadosymas.org;

7  classifiedsolutions.co.uk; classifiedsolutions.net;

8  classyadultads.com; columbusbackpage.com; connecticutbackpage.com;

9  cracker.co.id; cracker.com; cracker.com.au; cracker.id;

10 cracker.net.au; crackers.com.au; crackers.net.au; ctbackpage.com;

11 dallasbackpage.com; denverbackpage.com; easypost123.com;

12 easyposts123.com; emais.com.pt; evilempire.com; ezpost123.com;

13 fackpage.com; fastadboard.com; guliettagroup.nl; htpp.org;

14 ichold.com; internetspeechfoundation.com;

15 internetspeechfoundation.org; loads2drive.com; loadstodrive.com;

16 loadtodrive.com; losangelesbackpage.com; mediafilecloud.com;

17 miamibackpage.com; minneapolisbackpage.com; mobileposting.com;

18 mobilepostings.com; mobilepostlist.com; mobilposting.com; naked.city;

19 nakedcity.com; newyorkbackpage.com; paidbyhour.com; petseekr.com;

20 petsfindr.com; phoenixbackpage.com; posteasy123.com; postfaster.com;

21 postfastly.com; postfastr.com; postonlinewith.com; postonlinewith.me;

22 postseasy123.com; postsol.com; postszone24.com; postzone24.com;

23 postzones24.com; rentseekr.com; results911.com; sandiegobackpage.com;

24 sanfranciscobackpage.com; seattlebackpage.com; sellyostuffonline.com;

25 sfbackpage.com; simplepost24.com; simpleposts24.com; svc.ws;

26 truckrjobs.com; ugctechgroup.com; universads.nl;

27 villagevoicepimps.com; websitetechnologies.co.uk;

28 websitetechnologies.com; websitetechnologies.net;

websitetechnologies.nl; websitetechnologies.org; weprocessmoney.com; wst.ws; xn--yms-fla.com; ymas.ar.com; ymas.br.com; ymas.br.com; ymas.bz; ymas.bz; ymas.cl; ymas.cl; ymas.co.bz; ymas.co.bz; ymas.co.cr; ymas.co.cr; ymas.co.ni; ymas.co.ni; ymas.co.ve; ymas.co.ve; ymas.com; ymas.com.br; ymas.com.br; ymas.com.bz; ymas.com.bz; ymas.com.co; ymas.com.co; ymas.com.do; ymas.com.do; ymas.com.ec; ymas.com.ec; ymas.com.es; ymas.com.es; ymas.com.gt; ymas.com.gt; ymas.com.hn; ymas.com.hn; ymas.com.mx; ymas.com.ni; ymas.com.ni; ymas.com.pe; ymas.com.pe; ymas.com.pr; ymas.com.pr; ymas.com.pt; ymas.com.uy; ymas.com.uy; ymas.com.ve; ymas.com.ve; ymas.cr; ymas.cr; ymas.do; ymas.do; ymas.ec; ymas.ec; ymas.es; ymas.es; ymas.org; ymas.pe; ymas.pe; ymas.pt; ymas.us; ymas.us; ymas.uy; ymas.uy; and ymas.uy.com (collectively, the "Surrendered Domain Names"), and all rights and privileges associated therewith.

### OTHER BACKPAGE SURRENDERED ASSETS

ooo. $699,940.00 surrendered on or about April 6, 2018, from ING Bank account '7684, ("ING '7684 Funds"), held in the name of Payment Solutions BV.

ppp. $106,988.41 surrendered on or about April 6, 2018, from ING Bank account '2071 ("ING '2071 Funds"), held in the name of Payment Solutions BV.

qqq. $499,910.01 surrendered on or about April 6, 2018, from US Bank account '0239 ("US Bank '2039 Funds"), held in the name of Affordable Bail Bonds LLC.

rrr. $50,000.00 surrendered on or about April 6, 2018, from Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in the name of Global Trading Solutions LLC.

sss. $1,876.36 surrendered on or about August 23, 2018, from ING

18

Bank account '2071 ("ING '2071 Funds"), held in the name of Payment Solutions BV.

ttt. $50,357.35 surrendered on or about August 24, 2018, from ING Bank account '7684 ("ING '7684 Funds"), held in the name of Payment Solutions BV.

uuu. $248,970.00 surrendered on or about May 11, 2018, from Citibank NA, account '0457 ("Citibank NA '0457 Funds"), held in the name of Paul Hastings LLP.

vvv.   $52,500.00 surrendered on or about June 25, 2018, from

www. Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in the name of Global Trading Solutions LLC.

xxx. $65,000.00 surrendered on or about July 18, 2018, from Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in the name of Global Trading Solutions LLC.

yyy. $5,534.54 surrendered on or about August 9, 2018, from Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in the name of Global Trading Solutions LLC.

zzz. $40,000.00 surrendered on or about July 16, 2018, from Crypto Capital

aaaa.   6 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet;

bbbb.   199.99995716 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet;

cccc.   404.99984122 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet;

dddd.   173.97319 Bitcoins surrendered on or about April 26, 2018, from a Backpage controlled wallet;

eeee.   411.00019 Bitcoins surrendered on or about April 13,

2018, from a Backpage controlled wallet;

ffff.    2.00069333 Bitcoins surrendered on or about May 7, 2018, from a Backpage controlled wallet;

gggg.    136.6544695 Bitcoins surrendered on or about June 15, 2018, from a Backpage controlled wallet;

hhhh.    2,673.59306905 Bitcoins Cash surrendered on or about April 26, 2018, from a Backpage controlled wallet;

iiii.    55.5 Bitcoins Cash surrendered on or about May 3, 2018, from a Backpage controlled wallet;

jjjj.    73.62522241 Bitcoins Cash surrendered on or about June 15, 2018, from a Backpage controlled wallet;

kkkk.    16,310.79413202 Litecoins surrendered on or about April 26, 2018, from a Backpage controlled wallet;

llll.    783.9735116 Litecoins surrendered on or about June 15, 2018, from a Backpage controlled wallet;

mmmm.    509.81904619 Bitcoins Gold surrendered on or about June 21, 2018, from a Backpage controlled wallet; and

nnnn.    $3,713,121.03 surrendered on or about August 13, 2018, from Bank of America account '3414, held in the name of Davis Wright Tremaine, LLP.

## NATURE OF THE ACTION AND CLAIMS FOR RELIEF

5.    This is a civil action *in rem* to forfeit assets derived from or traceable to proceeds of one or more crimes defined as "specified unlawful activity" ("SUA"); and/or involved in one or more conspiracies to launder money, internationally launder money for promotion of one or more SUA, and/or financial transactions involving illicit proceeds.  The property sought for forfeiture is located in the United States and abroad, including the Country of Hungary, the

Czech Republic, the Principality of Liechtenstein, and the Kingdom of the Netherlands.

6.    The Subject Assets, including the Defendant Asset, represent property derived from or traceable to proceeds to multiple knowing violations of federal laws constituting SUA, including 18 U.S.C. §§ 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise).  The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

7.    Further, the Subject Assets, including the Defendant Asset, represent property involved in or traceable to one or more transactions or attempted transactions in violation of:

a.    18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering for Concealment) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h);

b.    18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h); and

c.    18 U.S.C. § 1957 (Monetary Transactions with Proceeds of SUA) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h).

The Defendant Asset is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## JURISDICTION AND VENUE

8.    This civil forfeiture action is brought pursuant to 18 U.S.C. § 981(a)(1).

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

21

10.   Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) or 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California and/or 28 U.S.C. § 1395(b), because certain of the Subject Assets are located in the Central District of California.

## INDIVIDUALS AND ENTITIES

11.   Backpage.com, LLC, ("Backpage") incorporated in Delaware in 2004, was an internet-based company that allowed customers to post on-line classified advertisements.  These advertisements were posted in a variety of categories, including adult, automotive, community, dating, jobs, local places, musicians, rentals and services.  Prior to its closure by federal law enforcement authorities in April 2018, Backpage was visited by 75 to 100 million unique internet visitors per month.

12.   Between 2004 and April 2018, Backpage realized annual profits of tens of millions of dollars from adult advertisements. Historically, the adult category, where Backpage advertisers posted sex trafficking ads, made up less than ten percent of all the website's advertisements.  However, those ads generated more than 90 percent of Backpage's revenue.

13.   Lacey was a co-creator of Backpage.com who was responsible for the website's policies and strategic direction.  Lacey maintained significant control over the website during the relevant period described in this complaint, and continued to receive tens of millions of dollars in Backpage-related distributions even after purportedly selling his interest in Backpage in 2015.

14.   Larkin was a co-creator of Backpage.com who was responsible for the website's policies and strategic direction.  Larkin

maintained significant control over the website during the relevant period described in this complaint, and continued to receive tens of millions of dollars in Backpage-related distributions even after purportedly selling his interest in Backpage in 2015.

15.    Carl Ferrer ("Ferrer"), though not an original owner, was a co-creator and one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO. Ferrer is also the CEO of several Backpage-related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

16.    John "Jed" Brunst ("Brunst") was a minority owner of Backpage who owned 5.67 percent of the company at the time of its inception.  Brunst served as the Chief Financial Officer of Backpage and several of Backpage's parent companies.

17.    Spear was a minority owner of Backpage who owned 4.09 percent of the company at the time of its inception.  Spear served as Executive Vice President of one of Backpage's parent companies.

18.    "M.G." had no formal position at Backpage, but was the President, Chief Executive Officer, Treasurer, and Secretary of Posting Solutions LLC, a wholly owned Backpage subsidiary with a principal place of business in Dallas, Texas ("Posting Solutions"), which accepted payments from Backpage advertisers.  M.G. was also the Chief Financial Officer of Website Technologies, and directed and controlled many of the international and domestic financial transactions of Backpage and its related entities.

19.    Daniel Hyer ("Hyer") served as Backpage's Sales and Marketing Director.  He remained an account signatory for numerous Backpage-controlled entities, including Website Technologies, until

23

Backpage's closure.

20.   Andrew Padilla ("Padilla") served as Backpage's Operations Manager.

21.   Joye Vaught ("Vaught") served as Backpage's assistant Operations Manager.

22.   Lacey, Larkin, Ferrer, Brunst, Spear, M.G., Hyer, Padilla, and Vaught are referred to collectively herein as "Backpage Operators."

<u>EVIDENCE SUPPORTING FORFEITURE</u>

**I.   The Formation and Evolution of Backpage**

23.   Lacey and Larkin were the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona.  Lacey and Larkin subsequently acquired several other alternative newspapers that they operated through an entity called Village Voice Media Holdings ("VVMH").  Spear served as VVMH's Executive Vice President and Brunst served as VVMH's Chief Financial Officer.

24.   As far back as the 1980's, VVMH publications routinely included ads for prostitution.

25.   By 2000, the popularity of the website www.craigslist.com ("Craigslist"), which offered free classified ads that included prostitution ads, began to disrupt VVMH's business, which depended on classified advertising revenue.

26.   Lacey and Larkin, assisted by Ferrer, sought to address this disruption by creating Backpage, which would compete directly with Craigslist.  As stated in an internal Backpage document, "[I]n 2004, in response to the Craigslist threat that was decimating daily newspapers, VVMH launched its own online classified site, Backpage.com, named after the back page of VVMH's print publication."

24

27.    From 2004 until 2015, Lacey and Larkin bore primary responsibility for Backpage's policies and strategic direction.  In 2015, Lacey and Larkin purported to sell to Ferrer all or substantially all of their respective interests in Backpage.  In fact, Lacey and Larkin retained significant control over Backpage, and both continued to receive millions of dollars of annual distributions of Backpage revenue after the purported sale.

28.    From its inception, most of Backpage's earnings represented the proceeds of illegal activity, specifically prostitution and sex trafficking, including child sex trafficking.  By 2015, the major credit card companies were refusing to process payments to or for Backpage, and banks were closing Backpage's accounts out of concern the accounts were being used for illegal purposes.

29.    In response to these measures, the Backpage Operators initiated and pursued a wide variety of money laundering strategies and techniques designed, in part, to conceal the source and location of the revenues generated by Backpage ads, including ads for human trafficking and illegal prostitution.  These strategies included (a) instructing customers to send checks and money orders to a Post Office box, funneling those funds into bank accounts held in the names of entities with no apparent connection to Backpage, and then giving customers a corresponding "credit" to purchase Backpage ads; (b) accepting Backpage proceeds through foreign bank accounts and thereafter redirecting the funds to Backpage Operators in the U.S. and abroad, or transferring the funds back to domestic bank accounts (to conceal the nature, source, location, ownership and control of those funds and promote Backpage's ongoing illegal operations); and (c) converting customers payments and the proceeds of Backpage's

illegal business into and out of  digital currency.[7]

II.  **The Sources and Manipulation of Backpage Criminal Proceeds**

    A.  **Backpage Promotion of Prostitution and Sex Trafficking**

    30.  Numerous Backpage ads were used to sell minors for sex and forcibly traffic adult women for sex.  Among the pimps and sex traffickers who used Backpage to advertise their victims were many who were later convicted of sex trafficking offenses.  For example,

    a.  During 2014 and 2015, a pimp sold S.F., a minor girl, for sex.  The pimp advertised S.F. on Backpage's "Escort" section in the Los Angeles area of California and in Arizona.  The ad contained phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}."  The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks.  The pimp who placed the ad was ultimately arrested, convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

    b.  During 2014 and 2015, the same pimp sold A.C., a minor girl, for sex.  In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire."  The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed in sexually provocative positions.

---

    [7] Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a sovereign government).  It exists entirely on the Internet and is not stored in any physical form.  It is not issued by any government, bank, or company, but is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Bitcoins, Bitcoins Cash and Litecoin are types of crypto-currency.

1       c.    Between November and December 2015, a pimp drove two women

2   and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio

3   to a hotel in St. Charles, Missouri.  The next day, the pimp told the

4   girls to post ads on Backpage.com.  Some of the girls took calls and

5   engaged in paid sex acts with Backpage customers who responded to the

6   ads.  The ads the girls posted included pictures of them on a bed

7   showing their buttocks.  Another image featured a naked girl's body

8   pressed against a mirror.  Other pictures appeared more mundane, such

9   as images of girls posing clothed in front of a mirror.  However,

10  these ads used phrases like "I'm sweet as a treat maybe even sweeter"

11  and "not a lot need to be said. my pic are 100% real."  In 2017, this

12  pimp was convicted of Federal sex trafficking charges and sentenced

13  to 300 months in prison.

14      d.    In or around 2010, in Washington, J.S., a minor girl, was

15  sold for sex through the use of Backpage ads.  J.S.'s pimp drafted

16  the ads, which contained words and phrases such as,

17  "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL."

18  The ads included pictures of J.S. in provocative positions showing

19  her breasts and buttocks.  On March 29, 2011, the pimp who sold J.S.

20  for sex was sentenced to over 26 years imprisonment on Federal

21  charges related to sex trafficking.

22      e.    Between 2011 and 2016, a female victim, D.O., who was

23  between the ages of 14 and 19 during those years, was sold for sex

24  through Backpage ads.  D.O.'s female pimp instructed D.O. that

25  Backpage was the safest place to advertise because Backpage did not

26  require age verification.  D.O.'s Backpage ads included words and

27  phrases that were indicative of prostitution, such as "roses" (money)

28  and "back door" (anal sex).  Some of the customers who responded to

27

1    D.O.'s Backpage ads forced D.O. to perform sexual acts at gunpoint,

2    choked her to the point of having seizures, and gang-raped her.

3        31.   Plaintiff alleges that all levels of Backpage management,

4    including the Backpage Operators, were aware of Backpage's role in

5    promoting criminal activity.  For example:

6        a.   On September 21, 2010, a group of state attorneys general

7    ("AG") wrote a letter to Backpage observing that "ads for

8    prostitution-including ads trafficking children-are rampant on the

9    site," and arguing that "[b]ecause Backpage cannot, or will not,

10   adequately screen these ads, it should stop accepting them

11   altogether."  The state AGs acknowledged that this step would cause

12   Backpage to, "lose the considerable revenue generated by the adult

13   services ads," but stated that "no amount of money can justify the

14   scourge of illegal prostitution, and the misery of the women and

15   children who will continue to be victimized in the marketplace

16   provided by Backpage."

17       b.   Also in mid-September 2010, Ferrer wrote an email

18   explaining that Backpage was unwilling to delete ads that included

19   terms indicative of prostitution because doing so would "piss[] off a

20   lot of users who will migrate elsewhere," and force Backpage to

21   refund those customers' fees.

22       c.   In January 2017, the U.S. Senate Subcommittee on Permanent

23   Investigations ("Subcommittee") conducted a lengthy investigation

24   into sex trafficking and Backpage, resulting in a 50-page report

25   entitled "Backpage.com's Knowing Facilitation of Online Sex

26   Trafficking."  The report concluded, among other things, that

27   virtually all of Backpage's "adult" ads were actually solicitations

28   for illegal prostitution services and that "Backpage [] maintained a

practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions-even as Backpage represented to the public and the courts that it merely hosted content others had created."  In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, a review of several thousand Backpage ads demonstrated that the prostitution ads simply migrated to other sections of the website, where they remained accessible until the site was forced to shut down.

d.   On August 5, 2011, Backpage received a letter from the mayor of Seattle.  This letter warned, "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010," and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  The letter recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads.  Backpage never instituted an in-person age verification requirement.

32.   Backpage instituted and maintained policies and procedures designed to cultivate and sustain its promotion of sex trafficking and prostitution, but which "sanitized" some of the language Backpage customers used to advertise in order to make the advertising of sex trafficking less overt.  Backpage referred to this practice as "moderation."  For example:

1       a.   In April 2008, Ferrer wrote an email explaining that,
2 although he (Ferrer) was "under pressure to clean up Phoenix's adult
3 content," he was unwilling to delete prostitution ads because doing
4 so "would put us in a very uncompetitive position with craig[slist]"
5 and result in "lost pageviews and revenue."  Ferrer instructed
6 Backpage's technical staff to edit the wording of such ads by
7 removing particular terms that were indicative of prostitution, but
8 allow the remainder of the ad to be featured on Backpage's website.

9       b.   On October 8, 2010, a Backpage manager sent an email to
10 certain Backpage employees and managers threatening to fire any
11 Backpage employee who acknowledged, in writing, that a customer was
12 advertising prostitution:  "Leaving notes on our site that imply that
13 we're aware of prostitution, or in any position to define it, is
14 enough to lose your job over. . . .  This isn't open for discussion.
15 If you don't agree with what I'm saying completely, you need to find
16 another job."

17       c.   On October 16, 2010, the same Backpage manager sent an
18 email to a large group of Backpage employees that contained two
19 attachments providing guidance on how to "moderate" ads.  The first
20 was a PowerPoint presentation that displayed a series of 38 nude and
21 partially-nude photographs, some of which depicted graphic sex acts.
22 Next to each picture was an instruction as to whether it should be
23 approved or disapproved by a Backpage moderator.  These instructions
24 included "Approve.  Nude rear shots are okay as long the model is not
25 exposing her anus or genitalia." and "Approve.  Rear shot okay.
26 Transparent wet panties okay."  The second attachment was an Excel
27 spreadsheet identifying 50 terms (all of which were indicative of
28 prostitution) that should be "stripped" from ads before publication.

The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

d.    On October 16, 2010, the same Backpage manager sent an internal email explaining, "I'd like to still avoid Deleting ads when possible;" "we're still allowing phrases with nuance;" and "[i]n the case of lesser violations, editing should be sufficient."

e.    On October 25, 2010, Ferrer sent an email to Padilla acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act."  This email also explained that, after the "sex act pics are removed," the "ad text may stay."

f.    On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

g.    On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person."  Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list.

h.    On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 "solid sex for money terms." Later emails indicate that this list of terms changed but, in general, the list prohibited use of certain terms that Backpage management and employees closely identified with the obvious promotion of sex trafficking and prostitution.

i.    One Backpage manager acknowledged in the August 31, 2011

email exchange that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of sex trafficking.  Nevertheless, Backpage published those ads after editing them to appear less obvious in promoting illegal activity.  Backpage sex trafficking ads adapted to Backpage's moderation policy by using "phrases with nuance" when promoting sex trafficking.  Following the implementation of "moderation," Backpage's list of prohibited terms changed and evolved over time to adjust to Backpage advertisers' use of new code words to promote prostitution.  In other words, once a code word or phrase not previously associated with sex-for-money became too familiar, or was deemed too closely associated with certain sex trafficking activities in the Backpage community of advertisers, Backpage's "moderation" policy would be adapted by adding such words or phrases to the "blocked" list or risk being too obvious in its promotion.

33.   Plaintiff alleges that Backpage's policy of "moderation" only caused ads explicitly promoting sex trafficking to become more coded and implicit in the ads' purpose.

a.   Well over half of the Backpage classified ads in various Backpage categories used terms and phrases (including "massage," "dating," "escort" and others) that are consistent with sex trafficking and prostitution.  These terms and phrases included, "roses" (money, *e.g.*, "150 roses/half hour"), "in-call" (where the customer goes to the prostitute's location), "outcall" (where the prostitute goes to the customer's location), "GFE" (girlfriend experience), and "PSE" (porn star experience).

b.   Other Backpage ads used language that was mostly free of coded language, but included sexually provocative images.  The

sexually suggestive images included in these ads were typical of ads for prostitution.  For example, one such ad posted in Backpage's Los Angeles dating section depicted images of a woman on a bed with her buttocks presented in a sexual manner; another included a picture of a woman's cleavage; others included pictures of women posing in sexual positions wearing lingerie and pictures of a woman bending over, revealing her naked buttocks.

c.  Backpage's policy of moderation had the effect of causing and allowing otherwise neutral or innocuous terms to be understood within the Backpage community as coded language for sex trafficking and prostitution.  Because of the evolving use of coded terms, a reader of such ads who was familiar with the particular vocabulary used in Backpage "adult" ads could readily identify coded terms and images indicating an ad for prostitution, while an uninitiated reader may not understand these terms at all, or at least not as being associated with sex-for-money.

34.  Almost all "adult"-type Backpage ads listed phone numbers or emails that a potential customer could use to make contact with the advertiser.  Comparing a sample of phone numbers and emails found within Backpage ads with phone numbers and emails that were frequently included in the memo sections of checks that Backpage advertisers use to pay Backpage for ads, revealed that the same numbers and/or email addresses appeared in multiple Backpage ads as contact information.  For example:

a.  A $25 USPS Money Order purchased on June 15, 2017, in Duarte, California, made payable to "Posting Solutions PO BOX 802426, Dallas, TX," and thereafter deposited into Account 1, bore a notation listing a phone number and the words "Dulce Latina."  A search of

1  Backpage ads showed almost 800 advertisements listing the same phone
2  number.

3      b.   A $20 USPS Money Order purchased in Sacramento, California,
4  and later deposited into Account 1 bore a notation listing a phone
5  number and the words "love my lips." A search of Backpage ads
6  revealed almost 1300 advertisements listing the same phone number.

7      c.   A $150 Wells Fargo Bank Money Order, purchased in Arizona,
8  and made payable to "Posting Solutions," bore an email address and
9  the words, "red hot stuff." The same email address was found to be
10 associated with advertisements on several female escort websites that
11 directed customers to contact an Arizona phone number ending in 2397.
12 A search of Backpage.com for this phone number revealed approximately
13 760 ads that included this phone number. These Backpage ads included
14 images indicative of prostitution. For example, one such ad posted
15 on Backpage's "massage" section included sexual images such as a
16 woman lying on a bed wearing lingerie and a woman laying naked on her
17 stomach. One of the ads described, "Pampering provider | Body Rub
18 Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or
19 appointment." Legal massage advertisements do not typically depict
20 sexual images. This advertisement depicted sexual images and
21 included terms like "4 hands," which is coded language describing a
22 massage given to a customer by two women. Such advertisements are
23 indicative of prostitution.

24     35.   The Backpage ads that shared the same phone number or email
25 address typically also included sexually suggestive images of
26 different women. Such ads are consistent with ads posted by pimps or
27 prostitution agencies that are using the same phone number or email
28 to advertise different women (or girls) to prospective prostitution

clients.

**B.   Payments for Advertising on Backpage**

36.   In order to post an ad on Backpage, an advertiser had to pay Backpage by one of several methods, including check, cash, and, until about 2015, credit card payments processed through U.S. credit card payment processors.  The proceeds from these ads, the vast majority of which were sexually explicit in nature, would then be deposited into various Backpage owned or controlled bank accounts. For example, Backpage's U.S. Bank account '1165, originated in or about April 2010, received several million dollars from the revenue generated from the sale of ads, including ads promoting the trafficking of minors and illegal prostitution.

37.   However, in or around 2015, following negative publicity associated with Backpage, some of the major credit card companies enacted what Backpage Operators termed a "blockade."  Essentially, these companies refused to process credit card payments directed to Backpage.  In order to circumvent the blockade, Ferrer and other Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments outside of the United States, with the funds being funneled to Backpage.

38.   Also in or around 2015, in response to the blockade, Backpage designed a mechanism to allow advertisers to buy Backpage "credits," which could be accomplished in several ways, including:

a.   mailing gift cards, checks, or money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas;

b.   using a credit card to buy credits through a third-party credit card payment processor;

c.   paying with digital currency (specifically, Backpage accepted Bitcoins, Bitcoins Cash, Litecoin, and Ethereum).  If the advertiser selected this option, Backpage provided a digital currency wallet address where the advertiser could send the electronic transfer of the digital currency; and

d.   paying with currency through a third party payment processor.  Once the third-party payment processor received the currency, it would convert it to digital currency and then electronically transfer that digital currency to a Backpage digital currency wallet.

39.   Digital Currency was processed through the subject accounts in the following way:

a.   When Backpage received digital currency, it would aggregate the digital currency and then transfer it to a third-party exchanger like GoCoin;[8]

b.   In exchange for the digital currency, the exchanger would transfer U.S. dollars from its foreign bank account(s) into Backpage operating accounts in the United States or elsewhere.  The exchanger could then sell its Bitcoins on various Bitcoins markets.

40.   Bitcoins payments for ads have resulted in the trafficking of minors for sex.  For example:

a.   On September 6, 2015, a Bitcoins account associated with the owner of the email address later convicted of having trafficked minors for sex paid Backpage about $4 worth of Bitcoins in order to

---

[8] GoCoin is a digital currency exchanger that converts Bitcoins and another digital currency into fiat currency, like the U.S. Dollar or the Euro.  GoCoin is owned by Manx Broadcasting Corporation, based in the Isle of Man.  GoCoin has offices in Singapore and Santa Monica, California, and GoCoin holds bank accounts in several countries, most or all of which are outside the United States.

post an ad promoting the trafficking of certain victims in Palm Springs, California.

    b.    On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of Bitcoins in order to "Fund Account"[9] for palmsprings.backpage.com.

    c.    On October 6, 2015, the same email address owner paid Backpage about $1 worth of Bitcoins to "Fund Account" on palmsprings.backpage.com.

    d.    On October 30, 2015, a Bitcoins account associated with the owner of the email address who trafficked minors for sex paid Backpage about $1 worth of Bitcoins in order to post an ad promoting the trafficking of certain victims in Columbus, Ohio.

    e.    On November 2, 2015, this same email address owner paid Backpage about $1 worth of Bitcoins to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

    f.    On November 21, 2015, this same email address owner paid Backpage about $1 worth of Bitcoins to Backpage for credit for that email owner's Backpage ad account.

    41.    Plaintiff contends that five to ten percent of the ads posted on Backpage.com were placed within the Central District of California (including Los Angeles and Orange Counties). Between January 10 and February 3, 2016, approximately 500,000 ads were posted on Backpage.com and paid for with Bitcoins, for which Backpage received over $3,840,000 in revenue. Of these approximately 500,000 ads, approximately 28,400 were posted only in LosAngeles.Backpage.com, Ventura.Backpage.com,

---

[9] The email address owner provided Bitcoins to Backpage as a "Fund Account" payment, that is, payment to Backpage as credit to be used later to pay for Backpage ads.

1   SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and
2   SanGabrielValley.Backpage.com.  These specific ads generated
3   approximately $184,479 in revenue.

4      42.   When an advertiser (or "poster") purchased an ad for
5   prostitution using digital currency, the payment to Backpage (and
6   certain subsequent expenditures) proceeded in the following manner:

7      a.   A poster would choose a payment method online (*e.g.*,
8   through Bitcoins payments);

9      b.   If the poster did not already have Bitcoins, the Backpage
10  website would direct the poster to a third-party exchanger to buy
11  Bitcoins;

12     c.   Backpage would then provide the poster with a wallet
13  address to send a specific amount of Bitcoins;

14     d.   In return for sending the required payment, the poster
15  would receive credit that could be used to post ads on Backpage.

16     e.   Backpage would sell the Bitcoins to a third party
17  exchanger, frequently GoCoin, in batches, generally valued in
18  hundreds of thousands, of dollars in order to convert the Bitcoins
19  into U.S. or foreign flat currency, which GoCoin generally, if not
20  always, would hold in foreign bank accounts;

21     f.   GoCoin would then wire funds from foreign accounts to
22  either (1) Backpage controlled foreign accounts; or (2) Backpage
23  controlled operating accounts in the United States;

24     g.   These accounts were held and controlled by Backpage
25  Operators in the names of entities controlled by Backpage, including
26  Ad Tech BV, Posting Solutions, Website Technologies, and Cereus
27  Properties.

28     h.   The funds derived from these foreign transactions would be

38

used by Backpage to pay service providers, like Verizon in Los Angeles, or transferred to Backpage Operators' accounts and accounts held in their family members' names.

    i.   For example:

    a.   In March 2015, Ad Tech BV, a Netherlands based company, listing Ferrer as CEO and M.G. as CFO, opened a bank account in the Liechtenstein (the "Netherlands Account").  M.G. is the President, CEO, Treasurer and Secretary of Posting Solutions.  From March 2015 through November 2017, the Netherlands Account received millions of dollars from Binary Trading SG PTE, Limited ("Binary Trading").  On April 4, 2017, M.G. sent an email to employees of the bank that maintains the Netherlands Account.  The email explained:

> Binary Capital is our trading partner, they hold money in trust for Go Coin [sic].  Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

    b.   For the period of September 4 through November 23, 2015, Backpage advertisers used Bitcoins to purchase about 1,000,000 "adult" ads from Backpage.  Backpage then sold those Bitcoins to GoCoin for approximately $8.6 million.  Included among the Bitcoins sold to GoCoin during this period were payments pimps made to Backpage to purchase ads to promote child prostitution.

    c.   For the period of December 14, 2015, through August 30, 2016, in approximately 154 wires, GoCoin accounts held in Slovakia (the "Slovakia Account") and Singapore Account (the "Singapore Account") transferred a total of approximately $26,100,235.83 to Branch Banking & Trust account '2008, in Plano, Texas, owned by Website Technology ("Website Tech Account '2008").

On January 15, 2016, the Website Tech Account '2008 transferred $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.

        d.    Between January 21 and August 31, 2016, Website Tech Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Arizona Bank & Trust account number '6211, belonging to Cereus Properties LLC, which is owned or controlled by Spear, Backpage, and/or other Backpage Operators.

**C.   Bases for Forfeiture**

43.   The Defendant Asset constitutes, and is derived from, proceeds traceable to one or more violations of: (1) 18 U.S.C. § 1591 (Sex Trafficking of Children); and/or (2) U.S.C. § and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is SUA under 18 U.S.C. § 1956(c)(7)(A), and a conspiracy to commit such offenses.

44.   The Defendant Asset was involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h).   Specifically, the Defendant Asset was involved in and is traceable to property involved in one or more financial transactions, attempted transactions, or a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is, 18 U.S.C. §§ 1591 and 1952, and was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the SUA in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

45.   The Defendant Asset was involved in, and is traceable to

property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957, or a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h). Specifically, the Defendant Asset was involved in and is traceable to property involved in one or more financial transactions, attempted transactions, or a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from SUA, that is, 18 U.S.C. §§ 1591 and 1952.

## III. Assets Representing, Traceable To, and Involved In Specified Unlawful Activity

### A.   Account 1 (Prosperity '7188 Funds)

46.   On February 15, 2017, Posting Solutions opened Account 1. M.G. is the sole signatory on the account (as described above, Posting Solutions is wholly owned by and controlled by Backpage).

47.   The application for the P.O. Box identifies the renter of the box as "Website Technologies, LLC/Backpage.com."  Listed on the Application were the names of several Backpage Operators, including Ferrer.

48.   Between August 1 and September 1, 2017, Account 1 received more than $2,781,750 in wire transfers from foreign banks.  For example:

a.   On or about August 16, 2017, Binary Trading wired $535,500 from an account in Singapore into Account 1.

b.   On or about August 17, 2017, Binary Trading wired $528,500 from a Singapore account into Account 1.

c.   On or about August 30, 2017, a company named Trilix PTE LTD ("Trilex"), listing the same Singapore address as Binary Trading and

GoCoin, sent four wire transfers from the Singapore account into Account 1, ranging from $385,450 to $492,250, totaling approximately $1,717,750.

49.   Plaintiff alleges that a substantial percentage of outgoing payments from Account 1 have been payments for the operation of Backpage.com.  For example, between July and October 2017, funds were wired from Account 1, as following:

a.   $570,530 to Verizon Digital Media Services in Los Angeles for services related to the Backpage.com website; and

b.   $1,497 to "Backupify," a company that provided data backup services for Backpage.

## CEREUS PROPERTIES ASSETS

**B.   Account 2 (Compass '3873 Funds)**

50.   Account 2 was held in the name of Cereus Properties LLC, and Spear was the sole signatory.  This account was funded in part with transfers from Account 1, which funds are alleged to have been traceable to SUA, involved in money laundering, or both, and was used as a funnel account to pay Backpage Operators.  On average, during each month of 2017, several hundred thousand dollars were transferred from Account 1 to Account 2.  For example:

a.   On August 31, 2017, Account 1 sent a wire transfer totaling $487,491.45 to Account 2.

b.   On September 15, 2017, Account 1 sent a wire transfer totaling $91,672.67 to Account 2.

c.   On October 2, 2017, Account 1 sent a wire transfer totaling $471,766 to Account 2.

51.   Funds from Account 2 were also used to promote and facilitate prostitution.  For example:

a.   On December 2, 2016, the Netherlands Account transferred $324,055.85 to Account 2;

b.   On December 8, 2016, the Netherlands Account transferred $499,970.00 to Account 2;

c.   On December 27, 2016, the Netherlands Account transferred $199,970.00 to Account 2; and

d.   From March to December 2017, Account 2 paid over $9,000 to "Cox Communications," an internet services company that Backpage used to facilitate its internet presence and promote its sale of prostitution advertising.

**C.   Account 3 (Compass '4862 Funds)**

52.   Account 3, held in the name of Cereus Properties, was funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both, including funds transferred from the Netherlands Account through one of the Backpage Operators' go-between accounts[10] (Wells Fargo Bank account '9863 ("Account '9863")), and eventually funneled into Account 3.

**MICHAEL LACEY ASSETS**

**D.   Account 4 (FFS&L of SR '3620 Funds)**

53.   Account 4, held in the name of Lacey, was funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both.   On October 2, 2017, Account 24 (which was itself funded with transfers from foreign and domestic banks with proceeds traceable to SUA, involved in money

---

[10] A "go-between" (*a.k.a.*, a "pass-through") is an account set up for the main purpose of transferring funds from one or more bank accounts to various other bank accounts, frequently as an attempt to further conceal the true source and nature of the funds.

laundering, or both), transferred $297,795 into Account 4, as further described below.

**E.    Accounts 5-10 (RBA '2485, '1897, '3126, '8316, '8324, and '8332)**

54.    Accounts 5, 6, and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5, 6, and 7 as pass-through accounts.

a.    On May 31, 2017, Account 2 transferred approximately $676,808.04 into Account 5;

b.    On June 30, 2017, Account 5 transferred $600,000 to Account 6.

c.    On October 2, 2017, Account 2 made two transfers:

i. $297,795.54 transferred to Account 4; and

ii. $694,856.25 wired to Account 11

d.    On April 16, 2018, Lacey personally went into the Republic Bank of Arizona, withdrew $500,000 from Account 5, and then used that $500,000 as the initial deposit to open Account 7.

e.    On or about February 15, 2018, Lacey drafted two $600,000 checks (totaling $1.2 million).  One check was drawn from Account 11, and the second was drawn from Account 4.  These two checks were used to fund Accounts 8, 9, and 10, respectively, with $600,000.00, $300,000.00, and $300,000.00.

**F.    Account 11 (SFFCU '2523 Funds)**

55.    Account 11 is held in the name of Lacey and an individual listed in the Credit Union's records as Lacey's employee and bookkeeper.  Account 11 was funded with proceeds alleged to have been

traceable to SUA, involved in money laundering, or both.

    a.   On February 2, 2018, Account 2 (which then contained funds traceable to SUA, involved in money laundering, or both) transferred $734,602.70 into Account 11.

### G.  Account 12 (IOLTA '4139)

56.   Account 12 was an IOLTA held for the benefit of Lacey, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

57.   On January 4, 2017, the Singapore Account wired $489,500 into a Posting Solutions controlled account held at Veritex Bank (the "Veritex Account").  On January 20, 2017, the Singapore Account directed two additional wires, for $358,150 and $470,150 respectively, into the Veritex Account.  In total, the Singapore Account transferred $1,317,800 into the Veritex Account.

    a.   On or about February 23, 2017, the Veritex Account directed two payments to Account 2, a wire of $443,014, and a check for $27,887.41.

    b.   Between March 30 and September 14, 2017, Account 2 sent five wires totaling $4,058.063.65 to Account 12.

    c.   In July 2018, Account 12 was closed and a cashier's check totaling $2,412,785.47 was issued to Lacey's Annuity Fund, held at Account 12.

### H.  The Sebastopol Property

58.   The Sebastopol Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

59.   In a series of transactions in December 2016, illicit proceeds from the Netherlands Account would pass-through Account 2,

eventually ending up in Account 11.  Additionally, between July and October 2017, additional illicit proceeds from the Singapore Account were passed-through Account 1 to Account 2, and eventually transferred to Account 11.  On or about October 10, 2017, over $10,000 of funds from Account 11 were used to support and maintain the Sebastopol Property.

60.  On February 11, 2016, a grant deed, instrument number 2016010019 of the Sonoma County official records, transferred the Sebastopol Property to Lacey.  Thereafter, on April 24, 2017, for no consideration, Lacey transferred title of the Sebastopol Property to his Delaware limited liability company, Sebastopol, LLC.  As noted in the grant deed:

> "There was no consideration for this transfer.  This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . ."

61.  On October 10, 2017, Lacey issued a $12,956.25 check from Account 11 to Sonoma County Tax Collector.  The notation on this wire was "2043 Pleasant Hill Dr Sebastopol."

**I.    San Francisco, California Property 1**

62.  San Francisco Property 1 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

63.  In order to acquire San Francisco Property 2, Lacey used funds transferred through the Singapore Account, the Website Tech Account '2008, and Cereus Properties accounts, as well as annuity accounts that Lacey controlled, as follows:

a.    Illicit proceeds were deposited into the Singapore Account,

1    passed-through Account 1, then passed-through Account 2 and

2    transferred to Account 11.   Thereafter, funds from Account 11 were

3    used to support and maintain San Francisco Property 1.

4        b.   On May 18, 2016, grant deed instrument number 2016-K245482-

5    00 of the San Francisco County official records, transferred San

6    Francisco Property 1 to Lacey and his female partner.

7        c.   Thereafter, on October 10, 2017, over $10,000 in funds from

8    Account 11 were used to purchase or maintain San Francisco Property 1.

9        **J.   San Francisco Property 2**

10   64.   San Francisco Property 2 was purchased and maintained, in

11   whole or in part, using funds traceable to SUA, involved in money

12   laundering, or both.

13   65.   During the period of December 14 through December 29, 2015,

14   as GoCoin's partial payment for the Bitcoins Backpage sold it during

15   the period of September 4 through November 23, 2015, the Slovakia

16   Account wired over $1,250,000 to Website Tech Account '2008.

17   66.   After December 14, 2015, Website Tech Account '2008 then

18   transferred funds via multiple pass-through accounts controlled by

19   Lacey and other Backpage Operators, which, as of June 21, 2016,

20   resulted in approximately $5,400,000 ending up in Arizona Bank &

21   Trust account '1793, controlled by Lacey ("AB&T Account '1793").

22   67.   On June 27, 2016, AB&T Account '1793 wired $397,500.00 to

23   Fidelity National Title Company.   The notation on this wire was

24   "XXX(Earnest Money)XXXXXX."   On July 20, 2016, AB&T Account '1793

25   wired $12,859,152.57 to Fidelity National Title Company.   The

26   notation on this wire was "XX(Balance of Property)XXXXX."

27   68.   Casa Bahia for San Francisco, LLC, a Delaware limited

28   liability company, was the entity used to take title to San

47

Francisco, California Property 2, and is owned by Lacey.  On July 21, 2016, by grant deed, San Francisco Property 2 was transferred to Lacey.  On June 21, 2017, by grant deed and for no consideration, Lacey transferred San Francisco Property 2 to Casa Bahai for San Francisco, LLC, a Delaware limited liability company, as evidenced by instrument number 2017-K466276099 of the San Francisco County official records.  As noted in the grant deed:

> There was no consideration for this transfer.  This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . .

**K.    San Francisco Property 3**

69.    San Francisco Property 3 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

70.    Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey.  In May 2015, over $10,000 of funds from BMO Harris account '5263 was used to purchase or maintain San Francisco Property 3.

**L.    Sedona Property**

71.    The Sedona Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

72.    In October 2017, Account 2 wired approximately $297,795 to Account 4.  On November 13, 2018, $6,725.54 from Account 4 was used to support or maintain the Sedona Property.

**M.   Paradise Valley Property 2**

73.   Paradise Valley Property 2 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

74.   In 2005, for approximately $1,500,000, Lacey purchased the Paradise Valley Property 2.  In 2010, the Paradise Valley Property was used as collateral for a $1 million loan (the "2010 Loan"). Beginning no later than January 2012, illicit proceeds were used to service the debt on the 2010 Loan.  Specifically:

a.   Between February 4 and June 6, 2013, through a series of wire transfers, Backpage's U.S. Bank account '1165 transferred approximately $41,500,000 to BMO Harris Bank account '5263.

b.   Between March 2013, and January 2016, through a series of periodic transactions, approximately $174,749.39 from BMO Harris Bank account '5263 was used to service the debt on the 2010 Loan.

**JAMES LARKIN ASSETS**

**N.   Accounts 13, 15, 16, 17, AND 18 (RBA '1889, '2592, '1938, '1897, '8103, '8162, AND '8189)**

75.   Account 13, held in the name of Larkin, was funded with proceeds alleged to have been traceable to SUA, involved in money laundering, or both.

a.   On July 6, 2017, Account 2 transferred $971,651.51 into Account 13.

b.   On July 28, 2017, Account 13 transferred $400,000 into Account 14.

76.   Account 15 is held in the name of Larkin.

a.   From March 2015 through November 2017, the Netherlands Account received several millions of dollars in criminal proceeds

from Binary Trading.

b.   On December 2, 2016, the Netherlands Account transferred $324,055.85 to Account 2.

c.   On December 8, 2016, the Netherlands Account transferred $499,970.00 to Account 2.

d.   On December 27, 2016, the Netherlands Account transferred $199,970.00 to Account 2, which account then transferred funds through Account '9863 and into Account 3.

e.   On December 13, 2017, Account 3 transferred $406,211.10 to Account 15.

77.   Account 16, 17, and 18 are CDARS Accounts held in the name of Larkin.

a.   On July 28, 2017, Account 13 transferred $400,000 into Account 14.

b.   On or about February 8, 2018, $1 million in funds from Account 14 was used to fund Account 16 (which received $500,000), Account 17 (which received $250,000), and Account 18 (which received $250,000).

**O.   Accounts 19 AND 20 (PCTC ACCOUNT '0012 FUNDS, PERKINS COIE '0012)**

78.   Account 19 is held in the name of Larkin's spouse, Margaret Larkin, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

a.   On December 31, 2015, Website Tech Account '2008 transferred $811,424 to the Slovakia Account.

b.   On January 11, 2016, the Slovakia Account transferred approximately $1,300,000 to Charles Schwab account '4693, held in the name of Larkin ("Charles Schwab Account '4693").

c.    On January 14, 2016, Charles Schwab Account '4693 transferred approximately $13,500,000 to Northern Trust Company account '9562 (under the name "Ocotillo Family Trust," owned and controlled by Larkin and Margaret Larkin).

d.    In July 21, 2017, Account '9562 transferred $6,014,000 to Morgan Stanley account '1673 (held in the name of Larkin and Margaret Larkin).

e.    In or about November 2017, Morgan Stanley elected to terminate its business relationship with Larkin.

f.    On November 30, 2017, all the funds then held in Morgan Stanley account '1673 (about $10,000,000) were transferred to Account 19.

g.    Some of the funds in Account 19 were used to purchase bonds and/or securities, which were held in Account 20.

**P.    Account 21 (ACF '2020)**

79.    Account 21 contains securities and investment vehicles held in the name of Ocotillo Family Trust, which is owned and controlled by Larkin and his spouse, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

a.    During the period of March 23 through March 31, 2016, Website Tech Account '2008 sent three wire transfers totaling $3,694,813.60 to Arizona Bank & Trust account number '6211, belonging to Cereus Properties ("Account '6211").

b.    During the period of April 1, 2016, through July 1, 2016, Account '6211 sent five wire transfers totaling $5,750,294 to Charles Schwab Account '4693.

c.    On July 1, 2016, Charles Schwab Account '4693 transferred $15,000,000 to Account 21.

51

d.   During the period of August 2, 2016, through October 6, 2016, Account '6211 sent six wire transfers totaling $9,550,315 to Charles Schwab Account '4693.

e.   On January 3, 2017, Charles Schwab Account '4693 transferred $2,500,000 to Account 21.

f.   On January 4, 2017, Charles Schwab Account '4693 transferred $2,500,000 Account 21.

**Q.   Accounts 22 AND 23 (BA '8225 and '7054)**

80.   Account 22 is held in the name of one of T. Larkin, and was used in furtherance of the money laundering scheme described herein, and in an attempt to further conceal or disguise the nature, location, source, ownership or control of the criminal proceeds.

81.   On February 2, 2018, Account 2 wire transferred $28,337 into Account 22.

82.   Account 23 is held in the name of R. Larkin.  On February 2, 2018, Account 2 wire transferred $28,337 into Account 23.

**R.   Saint Helena Property**

83.   The Saint Helena Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

84.   Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172.  On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to Larkin's BMO Harris Bank account '3110.  Thereafter, on November 3, 2016, over $10,000 of funds from BMO Harris Bank account '7172 were used to purchase or maintain the Saint Helena Property.

**S.   Chicago Property**

85.   The Chicago Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

86.   Illicit funds originating from Backpage's U.S. Bank account '1165 were passed-through accounts owned or controlled by Backpage or Backpage Operators, and ended up in BMO Harris Bank account '3110. Thereafter, on October 2, 2015, BMO Harris Bank account '3110 transferred $138,000 to Chicago Title and Trust Company as payment towards the purchase of the Chicago Property.

**T.   Paradise Valley Property 1**

87.   Paradise Valley Property 1 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

88.   Approximately $41.5 million in illicit funds from Backpage's U.S. Bank account '1165 passed through various Backpage or Backpage Operators accounts.  Following these various transfers, eventually, on October 2, 2013, a total of approximately $26,130.64 was transferred into BMO Harris account '3110, owned or controlled by Larkin.  Thereafter, on December 11, 2014, BMO Harris Bank account '3100 paid $46,957.28 to maintain the Paradise Valley property 1.

**U.   Paradise Valley Property 7**

89.   Paradise Valley Property 7 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both

90.   Illicit funds originating from Backpage's U.S. Bank account '1165 were passed-through accounts owned or controlled by Backpage or Backpage Operators, and ended up in BMO Harris Bank account '3110,

from which account over $10,000 was paid to maintain Paradise Valley Property 7.

### JOHN BRUNST ASSETS

**V.   Account 24 (COMPASS BANK '3825)**

91.   Account 24 is held in the name of Brunst, and was used in furtherance of the money laundering scheme described herein, and in an attempt to further conceal or disguise the nature, location, source, ownership or control of the proceeds of SUA.

92.   On February 2, 2018, Account 2 wire transferred $135,956.59 into Account 24.

**W.   Account 25, 26, 27, 28, 29, 30 (AB '6878, '4954, '7982, '7889, '7888 AND '6485)**

93.   Accounts 25, 26, 27, 28, 29, and 30 are held in the name of the "Brunst Family Trust."  Brunst and his wife are the sole trustees for these accounts, which were funded with proceeds traceable to SUA, involved in money laundering, or both.

a.   On December 31, 2015, Website Tech Account '2008 transferred $811,424 to Account '6211.

b.   On December 6, 2016, Account '6211 transferred $161,459 to Wells Fargo Bank account '4891, belonging to Brunst ("Account '4891").

c.   On January 4, 2017, Account '6211 transferred another $258,841 to Account '4891.

d.   On January 5, 2017, Account '4891 transferred $300,000 to Wells Fargo Bank account '7474, belonging to the Brunst Family Trust ("Account '7474").

e.   On May 19, 2017, Account '7474 transferred approximately $1,500,000 into Account 25.

f.    On May 23, 2017, Account 25 transferred approximately $350,000 to Account 25.

g.    On June 7, 2017, Account 25 transferred approximately $1,340,000 to Account 25.

h.    On September 13, 2017, Account 25 transferred approximately $581,000 to Account 27.

i.    On September 13, 2017, Account 25 transferred approximately $250,000 to Account 28.

j.    On September 13, 2017, Account 25 transferred approximately $250,000 to Account 29.

k.    On September 15, 2017, Account 25 transferred approximately $500,000 to Account 30.

**SCOTT SPEAR ASSETS**

**X.    Accounts 31, 32, AND 33 (NBA '0178, '0151, and '3645)**

94.    Accounts 31 and 32 are held in the name of Spear, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both.   Account 33 is held in trust for the benefit of Spear and certain of his family members, which account was funded with proceeds traceable to SUA, involved in money laundering, or both.   In furtherance of the money laundering scheme, and in an attempt to further conceal the true nature of the criminal proceeds, go-between accounts served to funnel money from one account to another.

a.    Between January 21 and August 31, 2016, Website Tech Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Account '6211.

b.    Between March 1, 2016, and July 1, 2016, Account '6211 transferred $892,426 into Account 31.

55

c.    On September 14, 2017, Account 2 wire transferred $50,162.05 into Account 31.

d.    On October 12, 2017, Account 31 transferred approximately $21,500 into Account 32.

e.    On January 5, 2018, Account 31 transferred approximately $600,000 into Account 33.

**Y.    Account 34 (Live Oak Bank Account '6910)**

95.   Account 34 is held in the name of Spear, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

96.   On or about March 16, 2016, as an opening deposit, Account 31 transferred $250,000 into Account 34.

**Z.    Account 35 and 36 (Ascensus Broker Services '4301 and'8001)**

97.   Accounts 35 and 36 are held in the name of N. Spear, Spear's adult daughter, and were funded with proceeds traceable to SUA, involved in money laundering, or both.

a.    On February 23, 2017, Account 31 transferred approximately $50,000 into Account 35.

b.    On the February 23, 2017, Account 31 transferred $50,000 into Account 36.

## **PRIMUS TRUST ASSETS**

**AA.        Account 37 (K&H Bank Account '1210)**

98.   Account 37 is located in Hungary, and held in the name of Primus Trust Company ("Binghampton Trust") for the benefit of Lacey. In furtherance of the money laundering scheme, Account 37 was funded with proceeds traceable to SUA, involved in money laundering, or both.

99.   The tracing of this account involves numerous banks and

bank accounts, both foreign and domestic.  The accounts include: Website Tech Account '2008; Account '6211; Arizona Bank & Trust annuity trust account numbers '1967, '1972, '1986, '1991, and '2014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account '9992, held in an IOLTA, with Lacey as the sole beneficiary.

a.   Between December 14, 2015, and January 15, 2016, the Slovakia Account sent approximately 26 wire transfers totaling over $2,500,000 to Website Tech Account '2008 in the United States.

b.   On January 15, 2016, Website Tech Account '2008 transferred $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services, which served, in whole or in part, to promote sex trafficking and illegal prostitution.

c.   Between January 21 and August 31, 2016, Website Tech Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Account '6211.

d.   Between April 1 and October 6, 2016, in approximately 12 wires, Account '6211 sent over $18,000,000 to the AZBT Annuity Trust Accounts.

e.   On December 29, 2016, in five wires, the AZBT Annuity Trusts Accounts sent approximately $16,500,000 to Johnson Financial account '9992.

f.   On January 3, 2017, Johnson Financial account '9992 transferred $16,500,000 to Account 37.

## AD TECH BV ASSETS

**BB.   Accounts 56, 57, and 58 (Fio Bank '5803, '5801, and '5805)**

100.  Accounts 56, 57, and 58 are located in the Czech Republic and held in the name of Ad Tech BV, identifying Ferrer as the

ultimate beneficial owner, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both.

101. Account 56, 57, and 58 were set up and maintained to receive payments for Backpage ads, that is, for "accounts receivable."  Merchant processors would accept credit card payments and Bitcoins from Backpage advertisers as credit to place ads for prostitution and other services.  The merchant processors would then transfer these funds to accounts set up to receive such payments, specifically including Accounts 56, 57, and 58.  All funds contained within Accounts 56, 57, and 58 are traceable to SUA and involved in money laundering.

**CC.   Accounts 47, 48, 49 and 50 (BF Accounts 'K000 K, 'K000 U, 'K000 E, and 'K001 K)**

102. Accounts 47, 48, 49, and 50 are located in Principality of Liechtenstein, and held for the benefit of Ferrer, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both.

103. Accounts 47, 48, 49, and 50 were set up and maintained to receive payments for Backpage ads, that is, for "accounts receivable."  Merchant processors would accept credit card payments and Bitcoins from Backpage advertisers as credit to place ads for prostitution and other services.  The merchant processors would then transfer these funds to accounts set up to receive such payments, specifically including Accounts 47, 48, 49, and 50.  All funds contained within Accounts 47, 48, 49, and 50 are traceable to SUA and involved in money laundering.

## GOLD LEAF SRO FUNDS HELD AT FIO BANK

**DD.  Account 38, 39, and 30 (Fio Bank '2226, '2231, and '2230)**

104.  Accounts 38, 39, and 40 are located in the Czech Republic, and held for the benefit of Backpage by a third party entity named, "Gold Leaf SRO."  Accounts 38, 39, and 40 were funded with proceeds traceable to SUA, involved in money laundering, or both.

105.  Accounts 38, 39, and 40 were created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into these accounts were to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Accounts 38, 39, and 40 are traceable to SUA and involved in money laundering.

## PROTECCTIO SRO FUNDS HELD AT FIO BANK

**EE.  Accounts 41, 42, and 43 (Fio Bank '4194, '4196, and '4198)**

106.  Accounts 41, 42, and 43 are located in the Czech Republic, and held for the benefit of Backpage by a third party entity named, "Protecctio SRO."  Accounts 41, 42, and 43 were funded with proceeds traceable to SUA, involved in money laundering, or both.

107.  Accounts 41, 42, and 43 were created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into these accounts were to be transferred to accounts held by Ad Tech BV, a Backpage controlled

company located in the Netherlands, after which transfer the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Accounts 41, 42, and 43 are traceable to SUA and involved in money laundering.

## VARICOK SRO FUNDS HELD AT FIO BANK

**FF.  Accounts 44, 45, and 46 (Fio Bank '8083, '8086, and '8080)**

108.  Accounts 44, 45, and 46 are located in the Czech Republic, and held in the name of Varicok Company SRO.  Accounts 44, 45, and 46 were funded with proceeds traceable to SUA, involved in money laundering, or both.

109.  Accounts 44, 45, and 46 were created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage. Approximately 99.5% of the payments into these accounts were to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Accounts 44, 45, and 46 are traceable to SUA and involved in money laundering.

## PROCOP SERVICES BV FUNDS HELD AT KNAB BANK

**GG.  Account 51 (KB '7664)**

110.  Account 51 is located in the Kingdom of the Netherlands, and held for the benefit of Backpage by a third party entity named, "Procop Services BV."  Account 51 was funded with proceeds traceable to SUA, involved in money laundering, or both.

111.  Account 51 was created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S.

credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into Accounts 51 was to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Account 51 are traceable to SUA and involved in money laundering.

**GULIETTA GROUP BV FUNDS HELD AT RABO BANK**

**HH.   Accounts 52 and 53 (RB '2452 and '4721)**

112.  Accounts 52 and 53 are located in the Kingdom of the Netherlands and held for the benefit of Backpage by a third party entity named, "Gulietta Group BV."  Accounts 52 and 53 were funded with proceeds traceable to SUA, involved in money laundering, or both.

113.  Accounts 52 and 53 were created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into these accounts were to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Accounts 52 and 53 are traceable to SUA and involved in money laundering.

**CASHFLOWS EUROPE LTD FUNDS HELD FOR GULIETTA GROUP B.V., UNIVERSADS B.V., PROCOPSERVICES B.V. and PROTECCIO SRO**

**II.   Account 55 (SP '1262)**

114.   Account 55 is located in the United Kingdom and held by a third party entity, "Cashflows Europe Limited" ("Cashflows"). Although Backpage is the ultimate beneficiary of Account 55, Cashflows acts first as an entity holding this account for the benefit of Gulietta Group B.V., Universads B.V., Procop Services B.V., and Proteccio SRO (collectively referred to as, the "Entities"), each of which company is owned or controlled by Backpage.  Account 55 was funded with proceeds traceable to SUA, involved in money laundering, or both.

115.   Account 55 was created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into Accounts 55 was to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Account 55 are traceable to SUA and involved in money laundering.

**JJ.   Account 54 (LHVP '4431)**

116.   Account 54 is an account maintained in the Republic of Estonia, held in the name of Olist OU for the benefit of Backpage. Account 54 was funded with proceeds traceable to SUA, involved in money laundering, or both.

117.   Account 54 was created outside the United States with the

intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage.  Approximately 99.5% of the payments into Accounts 54 was to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad.  All funds contained within Account 54 are traceable to SUA and involved in money laundering.

## BACKPAGE-CONTROLLED DOMAIN NAMES

### KK.  ASCIO/WMB Inc Domain Names

118.  Until recently, Backpage controlled numerous domain names, which have since been seized by the government pursuant to a seizure warrant issued in this district.[11]

119.  The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names.  A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold.

120.  Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver.  The Seized Domains were found to have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from Account 1, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity.

121.  The following domains constitute and are derived from

---

[11] 18-MJ-00711

proceeds traceable to SUA, involved in money laundering, or both:

     a.    atlantabackpage.com

     b.    backpage.be

     c.    backpage.com

     d.    backpage.com.br

     e.    backpage.cz

     f.    backpage.dk

     g.    backpage.ee

     h.    backpage.es

     i.    backpage.fi

     j.    backpage.fr

     k.    backpage.gr

     l.    backpage.hu

     m.    backpage.ie

     n.    backpage.it

     o.    backpage.lt

     p.    backpage.mx

     q.    backpage.net

     r.    backpage.no

     s.    backpage.pl

     t.    backpage.pt

     u.    backpage.ro

     v.    backpage.si

     w.    backpage.sk

     x.    backpage.us

     y.    backpage-insider.com

     z.    bestofbackpage.com

     aa.   bestofbigcity.com

bb.   bigcity.com

cc.   chicagobackpage.com

dd.   denverbackpage.com

ee.   newyorkbackpage.com

ff.   phoenixbackpage.com

gg.   sandiegobackpage.com

hh.   seattlebackpage.com

ii.   tampabackpage.com

**LL.   SURRENDERED DOMAIN NAMES**

122.   Until recently, Backpage also controlled numerous domain names that Backpage has since surrendered (pursuant to its guilty plea on April 5, 2018, in the District of Arizona).

123.   The following websites were purchased and/or maintained, in whole or in part, with proceeds traceable to SUA, involved in money laundering, or both:

a.   admoderation.com (Versio)

b.   admoderators.com (Versio)

c.   adnet.ws (NetNames)

d.   adplace24.com (Versio)

e.   adplaces24.com (Versio)

f.   adpost24.com (Versio)

g.   adpost24.cz (GoDaddy)

h.   adquick365.com (Versio)

i.   adreputation.com (NetNames)

j.   ads-posted-mp.com (Versio)

k.   adsplace24.com (Versio)

l.   adspot24.com (Versio)

1        m.    adspots24.com (Versio)

2        n.    adsspot24.com (Versio)

3        o.    adtechbv.co.nl (NetNames)

4        p.    adtechbv.com (NetNames)

5        q.    adtechbv.nl (NetNames)

6        r.    advert-ep.com (Versio)

7        s.    adverts-mp.com (Versio)

8        t.    axme.com (GoDaddy)

9        u.    back0age.com (NetNames)

10       v.    backpa.ge (NetNames)

11       w.    backpaee.com (NetNames)

12       x.    backpage-insider.com (NetNames)

13       y.    backpage.adult (NetNames)

14       z.    backpage.ae (NetNames)

15       aa.   backpage.at (NetNames)

16       bb.   backpage.ax (NetNames)

17       cc.   backpage.be (NetNames)

18       dd.   backpage.bg (European domains)

19       ee.   backpage.bg (NetNames)

20       ff.   backpage.ca (NetNames)

21       gg.   backpage.cl (NetNames)

22       hh.   backpage.cn (European domains)

23       ii.   backpage.cn (NetNames)

24       jj.   backpage.co.id (NetNames)

25       kk.   backpage.co.nl (European domains)

26       ll.   backpage.co.nl (NetNames)

27       mm.   backpage.co.nz (NetNames)

28       nn.   backpage.co.uk (NetNames)

1  oo. backpage.co.ve (NetNames)

2  pp. backpage.co.za (NetNames)

3  qq. backpage.com (NetNames)

4  rr. backpage.com.ar (NetNames)

5  ss. backpage.com.au (NetNames)

6  tt. backpage.com.ph (NetNames)

7  uu. backpage.cz (NetNames)

8  vv. backpage.dk (NetNames)

9  ww. backpage.ec (NetNames)

10  xx. backpage.ee (European domains)

11  yy. backpage.ee (NetNames)

12  zz. backpage.es (NetNames)

13  aaa. backpage.fi (European domains)

14  bbb. backpage.fi (NetNames)

15  ccc. backpage.fr (European domains)

16  ddd. backpage.fr (NetNames)

17  eee. backpage.gr (European domains)

18  fff. backpage.gr (NetNames)

19  ggg. backpage.hk (European domains)

20  hhh. backpage.hk (NetNames)

21  iii. backpage.hu (European domains)

22  jjj. backpage.hu (NetNames)

23  kkk. backpage.ie (NetNames)

24  lll. backpage.in (NetNames)

25  mmm. backpage.it (NetNames)

26  nnn. backpage.jp (NetNames)

27  ooo. backpage.kr (NetNames)

28  ppp. backpage.lt (NetNames)

1      qqq. backpage.lv (European domains)

2      rrr. backpage.lv (NetNames)

3      sss. backpage.me (NetNames)

4      ttt. backpage.mx (NetNames)

5      uuu. backpage.my (NetNames)

6      vvv. backpage.net (NetNames)

7      www. backpage.nl (NetNames)

8      xxx. backpage.no (European domains)

9      yyy. backpage.no (NetNames)

10     zzz. backpage.nz (NetNames)

11     aaaa.      backpage.pe (NetNames)

12     bbbb.      backpage.ph (NetNames)

13     cccc.      backpage.pk (NetNames)

14     dddd.      backpage.pl (NetNames)

15     eeee.      backpage.porn (NetNames)

16     ffff.      backpage.pt (NetNames)

17     gggg.      backpage.ro (European domains)

18     hhhh.      backpage.ro (NetNames)

19     iiii.      backpage.se (NetNames)

20     jjjj.      backpage.sex (NetNames)

21     kkkk.      backpage.sg (NetNames)

22     llll.      backpage.si (European domains)

23     mmmm.      backpage.si (NetNames)

24     nnnn.      backpage.sk (European domains)

25     oooo.      backpage.sk (NetNames)

26     pppp.      backpage.sucks (NetNames)

27     qqqq.      backpage.tw (NetNames)

28     rrrr.      backpage.uk (NetNames)

| 1  | ssss.  | backpage.uk.com (NetNames)       |
|----|--------|----------------------------------|
| 2  | tttt.  | backpage.us (NetNames)           |
| 3  | uuuu.  | backpage.vn (NetNames)           |
| 4  | vvvv.  | backpage.xxx (NetNames)          |
| 5  | wwww.  | backpage.xyz (NetNames)          |
| 6  | xxxx.  | backpagecompimp.com (NetNames)   |
| 7  | yyyy.  | backpagecompimps.com (NetNames)  |
| 8  | zzzz.  | backpagepimp.com (NetNames)      |
| 9  | aaaaa. | backpagepimps.com (NetNames)     |
| 10 | bbbbb. | backpagg.com (NetNames)          |
| 11 | ccccc. | backpagm.com (NetNames)          |
| 12 | ddddd. | backpagu.com (NetNames)          |
| 13 | eeeee. | backpaoe.com (NetNames)          |
| 14 | fffff. | backpawe.com (NetNames)          |
| 15 | ggggg. | backqage.com (NetNames)          |
| 16 | hhhhh. | backrage.com (NetNames)          |
| 17 | iiiii. | backxage.com (NetNames)          |
| 18 | jjjjj. | bakkpage.com (NetNames)          |
| 19 | kkkkk. | bcklistings.com (NetNames)       |
| 20 | lllll. | bestofbackpage.com (NetNames)    |
| 21 | mmmmm. | bestofbigcity.com (NetNames)     |
| 22 | nnnnn. | bickpage.com (NetNames)          |
| 23 | ooooo. | bigcity.com (NetNames)           |
| 24 | ppppp. | bpclassified.com (NetNames)      |
| 25 | qqqqq. | bpclassifieds.com (NetNames)     |
| 26 | rrrrr. | carlferrer.com (NetNames)        |
| 27 | sssss. | clasificadosymas.com (NetNames)  |
| 28 | ttttt. | clasificadosymas.net (NetNames)  |

```
 1        uuuuu.    clasificadosymas.org (NetNames)

 2        vvvvv.    classifiedsolutions.co.uk (NetNames)

 3        wwwww.    classifiedsolutions.net (NetNames)

 4        xxxxx.    classyadultads.com (Versio)

 5        yyyyy.    columbusbackpage.com (NetNames)

 6        zzzzz.    connecticutbackpage.com (NetNames)

 7        aaaaaa.   cracker.co.id (NetNames)

 8        bbbbbb.   cracker.com (NetNames)

 9        cccccc.   cracker.com.au (NetNames)

10        dddddd.   cracker.id (NetNames)

11        eeeeee.   cracker.net.au (NetNames)

12        ffffff.   crackers.com.au (NetNames)

13        gggggg.   crackers.net.au (NetNames)

14        hhhhhh.   ctbackpage.com (NetNames)

15        iiiiii.   dallasbackpage.com (NetNames)

16        jjjjjj.   denverbackpage.com (NetNames)

17        kkkkkk.   easypost123.com (Versio)

18        llllll.   easyposts123.com (Versio)

19        mmmmmm.   emais.com.pt (NetNames)

20        nnnnnn.   evilempire.com (NetNames)

21        oooooo.   ezpost123.com (Versio)

22        pppppp.   fackpage.com (NetNames)

23        qqqqqq.   fastadboard.com (Versio)

24        rrrrrr.   guliettagroup.nl (Versio)

25        ssssss.   htpp.org (NetNames)

26        tttttt.   ichold.com (NetNames)

27        uuuuuu.   internetspeechfoundation.com (nameisp)

28        vvvvvv.   internetspeechfoundation.org (nameisp)
```

```
 1          wwwwww.    loads2drive.com (NetNames)
 2          xxxxxx.    loadstodrive.com (NetNames)
 3          yyyyyy.    loadtodrive.com (NetNames)
 4          zzzzzz.    losangelesbackpage.com (NetNames)
 5          aaaaaaa.   mediafilecloud.com (NetNames)
 6          bbbbbbb.   miamibackpage.com (NetNames)
 7          ccccccc.   minneapolisbackpage.com (NetNames)
 8          ddddddd.   mobileposting.com (Versio)
 9          eeeeeee.   mobilepostings.com (Versio)
10          fffffff.   mobilepostlist.com (Versio)
11          ggggggg.   mobilposting.com (Versio)
12          hhhhhhh.   naked.city (NetNames)
13          iiiiiii.   nakedcity.com (NetNames)
14          jjjjjjj.   newyorkbackpage.com (NetNames)
15          kkkkkkk.   paidbyhour.com (NetNames)
16          lllllll.   petseekr.com (NetNames)
17          mmmmmmm.   petsfindr.com (NetNames)
18          nnnnnnn.   phoenixbackpage.com (NetNames)
19          ooooooo.   posteasy123.com (Versio)
20          ppppppp.   postfaster.com (NetNames)
21          qqqqqqq.   postfastly.com (NetNames)
22          rrrrrrr.   postfastr.com (NetNames)
23          sssssss.   postonlinewith.com (Versio)
24          ttttttt.   postonlinewith.me (Versio)
25          uuuuuuu.   postseasy123.com (Versio)
26          vvvvvvv.   postsol.com (GoDaddy)
27          wwwwwww.   postszone24.com (Versio)
28          xxxxxxx.   postzone24.com (Versio)
```

```
 1          yyyyyyy.  postzones24.com (Versio)

 2          zzzzzzz.  rentseekr.com (NetNames)

 3          aaaaaaaa. results911.com (NetNames)

 4          bbbbbbbb. sandiegobackpage.com (NetNames)

 5          cccccccc. sanfranciscobackpage.com (NetNames)

 6          dddddddd. seattlebackpage.com (NetNames)

 7          eeeeeeee. sellyostuffonline.com (Versio)

 8          ffffffff. sfbackpage.com (NetNames)

 9          gggggggg. simplepost24.com (Versio)

10          hhhhhhhh. simpleposts24.com (Versio)

11          iiiiiiii. svc.ws (NetNames)

12          jjjjjjjj. truckrjobs.com (NetNames)

13          kkkkkkkk. ugctechgroup.com (NetNames)

14          llllllll. universads.nl (Versio)

15          mmmmmmmm. villagevoicepimps.com (GoDaddy)

16          nnnnnnnn. websitetechnologies.co.uk (NetNames)

17          oooooooo. websitetechnologies.com (NetNames)

18          pppppppp. websitetechnologies.net (NetNames)

19          qqqqqqqq. websitetechnologies.nl (NetNames)

20          rrrrrrrr. websitetechnologies.org (NetNames)

21          ssssssss. weprocessmoney.com (GoDaddy)

22          tttttttt. wst.ws (NetNames)

23          uuuuuuuu. xn--yms-fla.com (NetNames)

24          vvvvvvvv. ymas.ar.com (European domains)

25          wwwwwwww. ymas.br.com (European domains)

26          xxxxxxxx. ymas.br.com (NetNames)

27          yyyyyyyy. ymas.bz (European domains)

28          zzzzzzzz. ymas.bz (NetNames)
```

| | | |
|---|---|---|
| 1 | aaaaaaaaa. | ymas.cl (European domains) |
| 2 | bbbbbbbbb. | ymas.cl (NetNames) |
| 3 | ccccccccc. | ymas.co.bz (European domains) |
| 4 | ddddddddd. | ymas.co.bz (NetNames) |
| 5 | eeeeeeeee. | ymas.co.cr (European domains) |
| 6 | fffffffff. | ymas.co.cr (NetNames) |
| 7 | ggggggggg. | ymas.co.ni (European domains) |
| 8 | hhhhhhhhh. | ymas.co.ni (NetNames) |
| 9 | iiiiiiiii. | ymas.co.ve (European domains) |
| 10 | jjjjjjjjj. | ymas.co.ve (NetNames) |
| 11 | kkkkkkkkk. | ymas.com (NetNames) |
| 12 | lllllllll. | ymas.com.br (European domains) |
| 13 | mmmmmmmmm. | ymas.com.br (NetNames) |
| 14 | nnnnnnnnn. | ymas.com.bz (European domains) |
| 15 | ooooooooo. | ymas.com.bz (NetNames) |
| 16 | ppppppppp. | ymas.com.co (European domains) |
| 17 | qqqqqqqqq. | ymas.com.co (NetNames) |
| 18 | rrrrrrrrr. | ymas.com.do (European domains) |
| 19 | sssssssss. | ymas.com.do (NetNames) |
| 20 | ttttttttt. | ymas.com.ec (European domains) |
| 21 | uuuuuuuuu. | ymas.com.ec (NetNames) |
| 22 | vvvvvvvvv. | ymas.com.es (European domains) |
| 23 | wwwwwwwww. | ymas.com.es (NetNames) |
| 24 | xxxxxxxxx. | ymas.com.gt (European domains) |
| 25 | yyyyyyyyy. | ymas.com.gt (NetNames) |
| 26 | zzzzzzzzz. | ymas.com.hn (European domains) |
| 27 | aaaaaaaaaa. | ymas.com.hn (NetNames) |
| 28 | bbbbbbbbbb. | ymas.com.mx  (NetNames) |

```
1        cccccccccc.    ymas.com.ni (European domains)
2        dddddddddd.    ymas.com.ni (NetNames)
3        eeeeeeeeee.    ymas.com.pe (European domains)
4        ffffffffff.    ymas.com.pe (NetNames)
5        gggggggggg.    ymas.com.pr (European domains)
6        hhhhhhhhhh.    ymas.com.pr (NetNames)
7        iiiiiiiiii.    ymas.com.pt  (NetNames)
8        jjjjjjjjjj.    ymas.com.uy (European domains)
9        kkkkkkkkkk.    ymas.com.uy (NetNames)
10       llllllllll.    ymas.com.ve (European domains)
11       mmmmmmmmmm.    ymas.com.ve (NetNames)
12       nnnnnnnnnn.    ymas.cr (European domains)
13       oooooooooo.    ymas.cr (NetNames)
14       pppppppppp.    ymas.do (European domains)
15       qqqqqqqqqq.    ymas.do (NetNames)
16       rrrrrrrrrr.    ymas.ec (European domains)
17       ssssssssss.    ymas.ec (NetNames)
18       tttttttttt.    ymas.es (European domains)
19       uuuuuuuuuu.    ymas.es (NetNames)
20       vvvvvvvvvv.    ymas.org (NetNames)
21       wwwwwwwwww.    ymas.pe (European domains)
22       xxxxxxxxxx.    ymas.pe (NetNames)
23       yyyyyyyyyy.    ymas.pt (NetNames)
24       zzzzzzzzzz.    ymas.us (European domains)
25       aaaaaaaaaaa.   ymas.us (NetNames)
26       bbbbbbbbbbb.   ymas.uy (European domains)
27       ccccccccccc.   ymas.uy (NetNames)
28       ddddddddddd.   ymas.uy.com (European domains)
```

74

## BACKPAGE SURRENDERED ASSETS

**MM.   Assets Surrendered To The United States By Backpage**

124.   On or about May 8, 2018, all of the funds, digital currencies, and other property listed in this subsection were transferred into the United States Postal Inspection Service holding bank account, Bitcoins wallet, Bitcoins Cash wallet, Litecoin wallet, and Bitcoins Gold wallet.  These Surrendered Assets constitute and are derived from proceeds traceable to SUA, involved in money laundering, or both.

125.   On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, Ferrer, in his capacity as CEO of Backpage, stipulated that the following bank funds, securities, or other assets are criminally derived proceeds of Backpage's illegal activity, involved in money laundering transactions, or both, and as such, are forfeitable property:

a.   $699,940.00 wire transferred from ING Bank account '7684, held in the name of Payment Solutions BV.

b.   $106,988.41 wire transferred from ING Bank account '2071, held in the name of Payment Solutions BV.

c.   $499,910.01 wire transferred from US Bank account '0239, held in the name of Affordable Bail Bonds LLC.

d.   $50,000.00 wire transferred from Enterprise Bank and Trust account '7177, held in the name of Global Trading Solutions LLC.

e.   $1,876.36 wire transferred from ING Bank account '2071, held in the name of Payment Solutions BV.

f.   $50,357.35 wire transferred from ING Bank account '7684, held in the name of Payment Solutions BV.

g.   $248,970.00 wire transferred from Citibank NA, account

'0457, held in the name of Paul Hastings LLP.

h.    $52,500.00 wire transferred from Enterprise Bank and Trust account '7177, held in the name of Global Trading Solutions LLC.

i.    $65,000.00 wire transferred from Enterprise Bank and Trust account '7177, held in the name of Global Trading Solutions LLC.

j.    $5,534.54 wire transferred from Enterprise Bank and Trust account '7177, held in the name of Global Trading Solutions LLC.

k.    $52,500.00  wire transferred from Crypto Capital

i.    6 Bitcoins transferred from a Backpage controlled wallet;

ii.   199.99995716 Bitcoins transferred from a Backpage controlled wallet;

iii.  404.99984122 Bitcoins transferred from a Backpage controlled wallet;

iv.   173.97319 Bitcoins transferred from a Backpage controlled wallet;

v.    411.00019 Bitcoins transferred from a Backpage controlled wallet;

vi.   2.00069333 Bitcoins transferred from a Backpage controlled wallet;

vii.  136.6544695 Bitcoins transferred from a Backpage controlled wallet;

viii.    2,673.59306905 Bitcoins Cash transferred from a Backpage controlled wallet;

ix.   55.5 Bitcoins Cash transferred from a Backpage controlled wallet;

x.    73.62522241 Bitcoins Cash transferred from a Backpage controlled wallet;

xi.   16,310.79413202 Litecoin transferred from a Backpage controlled wallet;

xii. 783.9735116 Litecoin transferred from a Backpage controlled wallet; and

xiii.   509.81904619 Bitcoins Gold transferred from a Backpage controlled wallet.

**NN.   BACKPAGE FUNDS PREVIOUSLY HELD AT DAVIS WRIGHT TREMAINE**

126.   On August 13, 2018, Davis Wright Tremaine initiated a wire transfer of $3,713,121.03 from Bank of America account '3414, held in the name of Davis Wright Tremaine, LLP into the government holding account.

a.   Between January 13 and January 20, 2017, a GoCoin account wire transferred $1,318,800 to the Veritex Account.

b.   On June 22, 2017, the Veritex Account wire transferred $1,000,000 into Account 27.

c.   On April 27, 2017, the Netherlands Account wire transferred $2,500,000 to Account 27.

d.   On April 28, 2017, the Netherlands Account wire transferred $2,500,000 to Account 27.

e.   On May 24, 2017, Account 1 wire transferred $500,000 into Account 27.

f.   On September 13, 2017, Account 1 wire transferred $1,000,000 into Account 27.

g.   On September 27, 2017, the Netherlands Account wire transferred about $778,802.96 into Account 27.

h.   On October 20, 2017, Account 1 wire transferred $500,000 into Account 27.

**FIRST CLAIM FOR RELIEF**

(18 U.S.C. § 981(a)(1)(C))

127.  Based on the facts set out above, Plaintiff alleges that the Defendant Asset constitutes, and is derived from, proceeds traceable to one or more violations of Title 18, United States Code, Sections 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.  The Defendant Asset is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**

(18 U.S.C. § 981(a)(1)(A))

128.  Based on the facts set out above, Plaintiff alleges that the Defendant Asset was involved in, and is traceable to, property involved in one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957, and a conspiracy to commit such offenses, in violation of section 18 U.S.C. § 1956(h). Specifically, the Defendant Assets was involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, to wit, violations of Title 18, United States Code, Sections 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.  The

78

1    Defendant Asset is therefore subject to forfeiture to the United
2    States pursuant to 18 U.S.C. § 981(a)(1)(A).

3                        **THIRD CLAIM FOR RELIEF**

4                        (18 U.S.C. § 981(a)(1)(A))

5          129.   Based on the facts set out above, Plaintiff alleges that
6    the Defendant Asset was involved in, and is traceable to property
7    involved in, one or more transactions or attempted transactions in
8    violation of section 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money
9    Laundering), (a)(2) (International Money Laundering), and a
10   conspiracy to commit such offenses, in violation of section 18 U.S.C.
11   § 1956(h).   Specifically, the Defendant Asset was involved in and is
12   traceable to property involved in one or more financial transactions,
13   attempted transactions, and a conspiracy to conduct or attempt to
14   conduct such transactions involving the proceeds of specified
15   unlawful activity, to wit, violations of Title 18, United States
16   Code, Sections 1591 (Sex Trafficking of Children) and 1952
17   (Interstate and Foreign Travel in Aid of Racketeering Enterprise),
18   each of which is a specified unlawful activity under 18 U.S.C.
19   §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a
20   conspiracy to commit such offenses.   The Defendant Asset is therefore
21   subject to forfeiture to the United States pursuant to 18 U.S.C. §
22   981(a)(1)(A).

23         WHEREFORE, plaintiff United States of America prays that:

24         (a)  due process issue to enforce the forfeiture of the
25   Defendant Asset;

26         (b)  due notice be given to all interested parties to appear and
27   show cause why forfeiture should not be decreed;

28

                                    79

1    (c)  that this Court decree forfeiture of the Defendant Asset to

2  the United States of America for disposition according to law; and

3    (d)  for such other and further relief as this Court may deem

4  just and proper, together with the costs and disbursements of this

5  action.

6  Dated: October 10, 2018          NICOLA T. HANNA
                                     United States Attorney
7                                    LAWRENCE S. MIDDLETON
                                     Assistant United States Attorney
8                                    Chief, Criminal Division
                                     STEVEN R. WELK
9                                    Assistant United States Attorney
                                     Chief, Asset Forfeiture Section
10

11                                   _____/s/*John J. Kucera*_____
                                     JOHN J. KUCERA
12                                   Assistant United States Attorney

13                                   Attorneys for Plaintiff
                                     United States of America
14

1

## **VERIFICATION**

2        I, Lyndon A Versoza, hereby declare that:

3        1.    I am a United States Postal Inspector with the United

4   States Postal Inspection Service.  I am the case agent for the civil

5   forfeiture action entitled *United States v. Any and All Funds Seized*

6   *from Rabo Bank Account '4721.*

7        2.    I have read the above Verified Complaint for Forfeiture and

8   know its contents, which is based upon my own personal knowledge and

9   reports provided to me by other agents.

10        3.    Everything contained in the Complaint is true and correct,

11   to the best of my knowledge and belief.

12        I declare under penalty of perjury that the foregoing is true

13   and correct.

14

15        Executed on October 11, 2018 in Los Angeles, California.

16

17

18        _____

19        LYNDON A VERSOZA
        U.S. Postal Inspector
20        United States Postal Inspection
        Service

21

22

23

24

25

26

27

28